David M. MANDELL, William M. Mandell, and Sam Field, Appellants,

v.

HAMMAN OIL AND REFINING COMPANY; Tennessee Gas Pipeline Company; Henry R. Hamman; Robert L. Baker; William V. Conover II; John Jennings; C.S. Wallace, Sr.; Arthur R. Stark, Jr.; John Wallace; Frank C. Nelms; John Sutton Allison; Lon Slaughter; Mrs. Wheeler Nazro; Frank C. Nelms, Independent Executor of the Estate of H.G. Nelms; Tenneco, Inc., Appellees.

No. 01–90–00950–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 27, 1991.

Rehearing Denied Dec. 19, 1991.

Brantly Harris, Houston and James D. Smullen, Wimberley, for appellants.

Bertrand C. Moser, Jim Flegle, Laura B. Herring, Houston, and Marty A. Morris, Dallas, for appellees.

Before SAM BASS, DUNN and HUGHES, JJ.

## OPINION

SAM BASS, Justice.

This appeal stems from a royalty suit to recover on a take or pay contract. The issue in this case is whether royalty owners are entitled to take or pay proceeds from a gas purchase contract. We hold that royalty owners are entitled to royalties for take or pay provisions, only if the parties expressly so provide in the lease.

### Summary of Facts

In 1978, appellants and Hamman Oil and Refining Company ("Hamman") executed three leases for 260 acres of land for oil and gas exploration. Paragraph 3(a) of the leases provided for royalties, as follows:

> (2) On gas, including casinghead gas or other gaseous substance, ¼ of ⅛ths (one-fourth of eight-eighths) of all produced, excepting that used for routine lease operations or unavoidably lost in conducting such operations.

In paragraph 3(b) of the leases, the lessor had:

> the right to take his royalty share of any production either in kind or value, at Lessor's election. Said royalty, whether in kind or value, shall be delivered free of cost to Lessor or Lessor's credit at the same delivery point at which Lessee disposes of its share of the same product.

Paragraph 3(c) obligated the producer, once production was obtained, to "immediately exercise its best efforts to obtain the most favorable market outlet for such production." The lessee was also required to use reasonable diligence to market all production under the best possible terms and conditions then obtainable and to endeavor to include in such contract a "favored nations" provision, a provision for the sale of gas on a per million British Thermal Unit ("MMBtu") basis, and annual price redetermination. The lessee was obligated to:

> promptly furnish Lessor with copies all proposals made to or received by Lessee from third parties for the purchase of any of such production.

Under paragraph 3(d), once the producer negotiated a contract for the sale of gas and provided a copy to the lessors, then, within 30 days after receipt of the contract:

> Lessor shall notify Lessee in writing as to whether Lessor elects to either (i) approve such contract or (ii) take in kind and separately dispose of Lessor's royalty share of such production.

Failure to give written notice of election "shall be conclusively deemed an election to approve the contract proposed by Lessee." If the Lessor:

> approves the contract proposed by Lessee, then Lessee shall account to Lessor for his royalty share of the production covered by such approved contract on the basis of the same price received by Lessee for the sale made under such contract.

In 1979, Hamman drilled successful gas wells on the property. Hamman signed a long term contract ("gas purchase contract" or "Hamman–Tennessee contract") with Tennessee Gas Pipeline Company ("Tennessee") to market gas production from one of the leases. The 1979 contract contained a take or pay provision requiring Tennessee either to take a certain percentage of the wells' deliverability or to pay Hamman for any gas not taken. Tennessee promised to take 85 percent of the gas available from Hamman or to pay for that amount, if not taken. Hamman had the right to collect this payment for gas not taken at the end of each contract year.

Henry Hamman, president of Hamman Oil, neglected to send a copy of the contract to the lessors. On request of William Mandell, in April of 1980, Mr. Hamman provided copies to William Mandell and Milton Mandell. In August of 1980, Mr. Hamman provided a copy to Sam Field.

In 1983, problems arose between Hamman and Tennessee. Faced with declining markets and reduced prices for its gas, Tennessee announced an "Emergency Gas Purchase Policy" on April 29, 1983. Tennessee determined that it would take no more than half of the gas that Hamman

could produce and would reduce the contract price to the minimum lawful rate for interstate gas. Tennessee refused to recognize any take or pay obligations for those producers who refused to amend their contracts as Tennessee demanded.

In 1986, Hamman sued Tennessee for breach of the 1979 contract. Hamman also asserted claims for Tennessee's unauthorized price reductions for gas that was taken and for drainage caused by Tennessee's violation of the ratable take provision. Tennessee paid Hamman $8,000,000 to settle. In return, Hamman dismissed all claims against Tennessee, and Hamman assigned all its interest in appellants' leases to Tennessee.

Hamman valued the sale of the working interest share of the reservoir at $6,508,000 and determined that the royalty owners were not entitled to share that portion of the settlement. Hamman further concluded that the recovery for take or pay claims was $626,000 and that the royalty owners should not share in this amount either. Hamman determined that the royalty owners were entitled to a portion of the recovery for price reduction and drainage claims and tendered checks totalling approximately $10,000 to appellants for their shares.

Appellants refused the money and sued both Hamman and Tennessee, asserting they were entitled to share in the take or pay portion of the settlement. In addition, appellants claimed they were entitled to sue Tennessee, or alternatively Hamman, for take or pay deficiencies.

The trial court granted Hamman's motion for partial summary judgment, ordering that, as a matter of law, Hamman owed the plaintiffs no royalty payments for take or pay payments Hamman received or might have received from Tennessee for gas not produced. The order was entered without prejudice to the claim of plaintiffs to collect take or pay payments from Hamman on any basis other than as royalty payments.

Summary of the Parties' Positions at Trial

At trial, plaintiffs (now appellants) maintained that, pursuant to the "in kind" royalty provision in the lease, Hamman acquired title to only 75 percent of the gas. Thus, 25 percent still belonged to plaintiffs. Under this theory, plaintiffs retained one-fourth of the gas in kind, and Hamman sold the royalty gas as agent for the owners of that gas. Therefore, according to plaintiffs, any contract Hamman signed with Tennessee was for the sale of the one-fourth of the gas belonging to plaintiffs and for the three-fourths of the gas belonging to Hamman. When Hamman signed the gas purchase contract with Tennessee in 1979, Hamman was selling plaintiffs' gas to Tennessee on the same terms that Hamman did, or, alternatively, plaintiffs sold their gas to Hamman on the same terms that Hamman sold to Tennessee. Plaintiffs also claimed they did not "acquiesce" in the gas purchase contract by failing to elect to take their share in kind; rather, they intended to be in the same position as if they had been signatory-sellers to the Hamman–Tennessee contract. Further, since Hamman was selling only 75 percent of the gas to Tennessee, Hamman had no right to settle plaintiffs' claims against Tennessee for anything attributable to plaintiffs' 25 percent of the gas.

Hamman's position was that the relationship of the parties was determined by provisions of the lease and by the plaintiffs' undisputed conduct of accepting royalties without making any effort to take gas in kind. Plaintiffs were ordinary in value royalty owners, who were not entitled to take or pay and were not entitled to any part of the Tennessee settlement that Hamman received for take or pay deficiencies accrued by Tennessee. Plaintiffs were entitled to recover from Hamman the portion of the Hamman–Tennessee settlement that was properly allocable to Hamman's recovery for Tennessee's improper pricing and for drainage caused by Tennessee's failure to take ratably.

Tennessee asserted that, prior to January 1, 1987, it had no contract with the plaintiffs, either express or implied, and that plaintiffs were not intended third party beneficiaries of the Hamman–Tennessee contract. Further, Tennessee assumed no

obligations, contractual or otherwise, toward plaintiffs prior to that date.

The case was tried to a jury, and the trial court entered judgment on the verdict; awarded appellants $18,982 for the royalty share of the Hamman–Tennessee settlement attributable to the recovery for drainage and pricing claims; denied all causes of action asserted by appellants against Tennessee; and granted declaratory relief sought by Tennessee to the effect that Tennessee had no privity of contract with or liability to appellants. Appellants were awarded nothing for any share of the settlement attributable to the sale of the leases or to recovery for take or pay claims. Appellants were given a judgment for $18,982 for their royalty share of the settlement pertinent to pricing and drainage claims asserted by Hamman against Tennessee, $6,238.26 for Hamman's failure to make a timely filing with the Federal Energy Regulatory Commission, and $2,058.63 for attorney's fees. This appeal followed.

In 16 points of error, appellants assert that the trial court erred in overruling appellants' motion for judgment on the verdict and notwithstanding the verdict and in overruling appellants' amended motion for new trial. This Court notes that appellants' points of error are structured in such a global fashion that, in many instances, it is difficult to discern appellants' specific complaint on appeal. Often, the wording of the points of error changes drastically in the body of the argument and points of error are blended, making the task of responding to them separately difficult and cumbersome. As such, we will surmise that appellants' points of error raise complaints of legal and factual insufficiency about the jury findings and the entry of judgment on those findings.

## Standards of Review

■ In order for a trial court to disregard a jury's findings and to grant a motion for judgment notwithstanding the verdict, it must determine that there is no evidence upon which the jury could have relied for its findings. *Exxon Corp. v. Quinn*, 726 S.W.2d 17, 19 (Tex.1987); *Na-*varette v. Temple Indep. School Dist., 706 S.W.2d 308, 309 (Tex.1986). Denial of a motion for judgment notwithstanding the verdict is proper if there is more than a scintilla of competent evidence to support the jury's verdict. *Navarette*, 706 S.W.2d at 309. The appellate court reviews the record in the light most favorable to the verdict, considering only the evidence and inferences that support the verdict and rejecting evidence and inferences to the contrary. *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex.1990); *Schaefer v. Texas Employers' Ins. Ass'n*, 612 S.W.2d 199, 201 (Tex.1980).

■ A trial court has wide discretion in denying a motion for new trial, and its action will not be disturbed on appeal absent a showing of an abuse of discretion. *Jackson v. Van Winkle*, 660 S.W.2d 807, 809 (Tex.1983). The standard of review depends on the complaint preserved by the motion for new trial. Sufficiency of the evidence challenges are governed by legal and factual sufficiency standards of review.

■ If an appellant is attacking the legal sufficiency of an adverse finding to an issue on which that party had the burden of proof, the appellant must demonstrate on appeal that the evidence conclusively established all vital facts in support of the issue. *Ritchey v. Crawford*, 734 S.W.2d 85, 86 (Tex.App.—Houston [1st Dist.] 1987, no writ). In reviewing a "matter of law" challenge, the appellate court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. If there is no evidence to support the finding, the reviewing court then examines the entire record to determine if the contrary proposition is established as a matter of law. *Holley v. Watts*, 629 S.W.2d 694, 696–97 (Tex.1982).

■ Only one standard of review is used in reviewing factual sufficiency challenges, regardless of whether the court of appeals is reviewing a negative or affirmative jury finding or whether the complaining party had the burden of proof on the issue. *M.J. Sheridan & Son v. Seminole Pipeline*, 731

S.W.2d 620, 623 (Tex.App.—Houston [1st Dist.] 1987, no writ). The court of appeals must examine all of the evidence, *Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986), and, having considered and weighed all of the evidence, it should set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

### Appellants Were Not Parties to the Gas Purchase Contract

Point of error one maintains that the trial court erred in not holding that Tennessee bought appellants' royalty gas upon the terms and conditions set forth in the gas purchase contract and in failing to disregard the jury's answer to question number one. Points of error two, three, and seven set forth appellants' argument that the trial court erred in not holding that appellants were entitled to reformation of the gas purchase contract to include the sale of the royalty gas under the leases; in not holding that appellants were third party beneficiaries to the gas purchase contract and in failing to disregard the jury's answer to question number 4F, that the gas purchase contract was not intended to benefit the plaintiffs; and in not holding that the record is legally or factually insufficient to support the finding of the jury in answer to question number 11 that Hamman had any authority from appellants to settle the appellants' claims against Tennessee for breach or repudiation of the contract to purchase their royalty gas.

Appellants' main contention is that the jury should have found that they were party sellers under the gas purchase contract between Hamman and Tennessee. Jury question number 1 states, with answers:

Did Tennessee enter into a contract with the Plaintiffs to purchase their royalty gas upon the terms and conditions set forth in the Gas Purchase Agreement? Answer "Yes" or "No" as to each Plaintiff.

With Sam Field?

Answer: <u>No</u>

With David M. Mandell's Guardian?

Answer: <u>No</u>

With William M. Mandell?

Answer: <u>No</u>

The jury was instructed not to answer question number 2 unless it answered question number 1, "We do." Likewise, the jury was instructed not to answer questions 3 and 4, unless it answered question number 2, "We do." Questions 2, 3, and 4 pertain to whether Tennessee breached or repudiated the alleged "contract" with appellants and ask what sum would compensate appellants for damages resulting from the breach or repudiation.

■ Appellants assert in their brief that the jury was "confused" concerning the contract and agency issues they submitted; however, appellants failed to object to this issue or any issues contained in the court's charge. Appellants, therefore, waived any right to complain on appeal about questions, instructions, or definitions contained in the charge. *Gulf Coast State Bank v. Emenhiser*, 562 S.W.2d 449, 452–53 (Tex. 1978); Tex.R.App.P. 52(a). Appellants' complaints in this regard will not be considered, where their trial counsel drafted the definitions that were adopted by the court. This Court will assume that the jury properly followed the trial court's instructions. *Turner, Collie & Braden v. Brookhollow*, 642 S.W.2d 160, 167 (Tex. 1982).

■ We hold that the district court correctly entered judgment on the jury's answer to question number 1 because there was sufficient evidence, both legally and factually, that appellants were not parties to the gas purchase contract. First, we examine the language of the lease itself. In construing the provisions of an oil and gas lease, the court must determine the intention of the parties, as expressed in the lease. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 727–28 (Tex.1981). The lease itself is deemed to express the intent of the parties, unless the terms are ambiguous. *Schwartz v. Prairie Prod. Co., Inc.*, 727 S.W.2d 289, 291 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). Royalties to which lessors are entitled must be deter-

mined from the provisions of the oil and gas lease. *Texas Oil & Gas Corp. v. Vela*, 429 S.W.2d 866, 870 (Tex.1968).

Our review of the lease indicates that appellants had two options after receipt of the gas purchase contract. They could acquiesce in the contract, in which event they became "in value" royalty owners, or they could take their gas "in kind" and negotiate their own contract with Tennessee or any other purchaser. The lease offers no other alternatives, contrary to appellants' claims that they could market their gas in kind to Tennessee and acquiesce in Hamman's contract. We note that, under appellants' theory, they would be in the same position as the producer, without taking the producer's financial risks in drilling the wells and marketing the production.

Appellants were not novices when they entered into negotiations with Hamman for the oil and gas lease. The record reflects that negotiations for the lease lasted about a year. William Mandell made extensive demands about changes he wanted and consulted with an engineer about the terms of the lease. Field, in turn, was assisted by his lawyer. The final lease was the product of 10 prior drafts. Appellants acknowledged that a provision could have been included in the leases that authorized the royalty owners to claim take or pay, in the event that such a gas purchase contract were executed with a buyer.

Appellants were required to affirmatively elect under the leases to take their royalty share in kind. Paragraph 3(d) of the lease gave appellants the opportunity to negotiate a gas purchase contract with Tennessee, if appellants had notified Hamman, in writing, that they would take their share in kind. The evidence indicates that appellants failed to give notice within the 30 day period after Mr. Hamman tendered the Hamman–Tennessee contract to them and, thus, elected to approve the contract and receive royalties based on *production*.

The effect of appellants' failure to elect was that their royalty interest under the leases was an economic interest. This interest entitled them to receive proceeds from the sale of the gas, but not to sell or otherwise to market the gas. One of the appellants, William Mandell, testified that a royalty owner does not sell gas.

The Hamman–Tennessee contract lists Henry Hamman and his investors as sellers. Each of them signed the contract. The royalty owners did not sign the gas purchase contract. Though appellants were aware of the contract in 1980, they had no communication with Tennessee about the contract for nearly seven years. No royalty payments were made in kind, and none of the royalty owners ever made a demand on Tennessee for take or pay payments.

Appellants erroneously refer in their brief to the term "royalty gas," asserting that this term connotes gas that is "payable in kind." Our review of the record indicates that the term "royalty gas" never appeared in any document introduced at trial, including the leases and the gas purchase contract. Further, the authorities relied on by appellants relate to cases in which the royalty owner actually elected to take gas in kind. None of the cases cited by appellants involves a royalty clause or lessor-lessee relationship similar to the one at issue in this appeal. *See, e.g., Hager v. Stakes*, 116 Tex. 453, 294 S.W. 835, 840 (1927) (lessor, in effect, reserved the right to receive the oil itself, not merely the right to elect to receive payment for a royalty interest in oil); *Cook v. Tompkins*, 713 S.W.2d 417, 420 (Tex.App.—Eastland 1986, no writ) (lease obligated lessee to deliver lessor's proportionate share of production in kind to lessor).

Defendants offered a memorandum of February 1987, which was written after Milton Mandell had a phone conversation with Julian Kornfield. Kornfield told Mandell that if he could devise a theory by which the royalty owners could be deemed parties to the gas purchase contract, then Tennessee would be in a difficult situation. We find there was sufficient evidence for the jury to conclude that the royalty owners never considered themselves to be parties to the Hamman–Tennessee contract until over six years after appellants received notice of the gas purchase contract.

Appellants did not have title to or the right to sell the gas under the Hamman–Tennessee contract. Further, appellants did not have the legal capacity to sell the gas to Tennessee under the contract, nor did they take any action to do so.

Point of error three sets forth appellants' contentions that the trial court erred in not holding that appellants were third party beneficiaries to the gas purchase contract. In order to recover under their breach of contract claim, appellants were required to show privity of contract with Tennessee, *Major Inv., Inc. v. De Castillo*, 673 S.W.2d 276, 279 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.), or that they were intended third party beneficiaries of the contract. *Hellenic Inv., Inc. v. The Kroger Co.*, 766 S.W.2d 861, 864–65 (Tex.App.—Houston [1st Dist.] 1989, no writ). In Texas, a third party cannot bring an action on a contract unless the party shows that the contract was actually made for his benefit and that the parties intended that the contract be for his benefit. *Merrimack Mutual Fire Ins. Co. v. Allied Fairbanks Bank*, 678 S.W.2d 574, 577 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). A contract will not be interpreted as having been made for the benefit of a third party unless it clearly appears that was the intention of the parties to the contract. *Texas Bank & Trust Co. v. Lone Star Life Ins. Co.*, 565 S.W.2d 353, 357 (Tex.Civ.App.—Tyler 1978, no writ). Any doubt is resolved against a finding that the party was intended to be a third party beneficiary. *Id.* at 357. One who is benefitted incidentally by performance of a contract may not seek enforcement of the contract. *M.E. Sandlie Trust v. Pioneer Nat'l Title Ins. Co.*, 648 S.W.2d 761, 762 (Tex.App.—Corpus Christi 1983, no writ).

The gas purchase contract was executed between Tennessee and Hamman, with Hamman as the seller and Tennessee as the buyer. Appellants admitted that no contract existed between Tennessee and appellants since January 1, 1987, concerning royalty obligations. Appellants had no communications, conversations, or dealings with Tennessee before the existence of the gas purchase contract, during negotiation of the contract, or after execution of the contract for a period of approximately seven years. All of appellants' communications were with Hamman. Further, the gas purchase contract contains no obligations to appellants.

William Mandell did not notify Tennessee either before or after 1987 that he believed any of the gas under the contract belonged to him. At trial, he testified that he believed the gas belonged to the lessee (Hamman); that he never asked Tennessee why his name did not appear anywhere in the gas purchase contract as a "seller"; and that he did nothing that a seller under the gas purchase contract was required to do, such as drilling new wells on the property, repairing or reworking old wells, plugging wells, measuring gas, paying production expenses, or creating or submitting take or pay invoices. Similarly, Milton Mandell never called anyone at Tennessee to tell them he believed he was a party to the gas purchase contract or performed any of the seller's duties. Sam Field did not request that he be made a party to the contract, nor did he exercise any of the rights or obligations of a seller under the gas purchase contract.

In point of error two, appellants assert that the district court erred in ruling that their equitable cause of action against Tennessee for reformation was barred by the statute of frauds. This Court is hard pressed to determine how a nonexistent contract could be reformed. *See McClellan v. Boehmer*, 700 S.W.2d 687, 694 (Tex. App.—Corpus Christi 1985, no writ) (equity may reform an instrument to reflect agreement; however, equity cannot be invoked to create an agreement not made). A person may not maintain an action for reformation if he is not a party or privy to the contract. *Sims v. Haggard*, 162 Tex. 307, 346 S.W.2d 110, 114 (1961). We hold that, as a matter of law, appellants may not maintain a cause of action for reformation.

Further, the final judgment does not address the issue of reformation; rather, it found that appellants' implied contract claims, if any, were barred by the

statute of frauds. The statute of frauds applies to bar enforcement of implied, as well as express, contracts. *Molder v. Southwestern Bell Tel. Co.*, 665 S.W.2d 175, 177 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). There was some evidence supporting the finding that the statute of frauds applied to appellants' contractual claims. An agreement that is not to be performed within one year from the date of making the agreement is not enforceable unless the promise or agreement, or memorandum of the agreement, is in writing and signed by the party to be charged. TEX.BUS. & COM.CODE ANN. § 26.01 (Vernon 1987). The only writing in this case signed by Tennessee prior to December 30, 1986, is the gas purchase contract with Hamman. The performance under the gas purchase contract extended for more than one year. Thus, the alleged contract with appellants was not performable within one year from the date of the alleged making of the agreement.

In point of error seven, appellants maintain that there was no evidence that Hamman had authority to settle for them. We conclude that since there was sufficient evidence from which the jury could conclude that the royalty owners were not parties to the gas purchase contract, the royalty owners had no claims against Tennessee under the contract. Therefore, appellants had no claims against Tennessee for Hamman to settle.

We hold that there was sufficient evidence, both legally and factually, that appellants were neither parties nor intended third party beneficiaries to the gas purchase contract with Tennessee either prior to January 1, 1987, or thereafter, to support the verdict of the jury and the final judgment of the court. We overrule points of error one, two, three, and seven.

In points of error four and nine, appellants assert that the trial court erred in not holding that Tennessee breached and repudiated the gas purchase contract as concerns appellants' royalty share; in not holding that Tennessee breached and repudiated the gas purchase contract as concerns appellants' royalty share of the gas; in not

holding that appellants have a cause of action against Tennessee for their damages separate and apart from their cause of action for damages against Hamman; and in not holding that Tennessee breached and repudiated its marketing and other obligations as lessee after it acquired the leasehold estate in the three leases (as of January 1, 1987). Appellants' arguments under points of error four and nine relate to alleged acts by Tennessee which, appellants contend, constitute breaches of a contract that the jury found did not exist between appellants and Tennessee. We hold that the jury's finding on question number one, that Tennessee did not enter into a contract with appellants, which finding is based on legally and factually sufficient evidence, is conclusive in regard to whether the court erred in not holding that Tennessee breached and repudiated the gas purchase contract regarding appellants' alleged royalty share and whether appellants have a cause of action against Tennessee for damages separate and apart from their cause of action for damages against Hamman. Point of error four is overruled.

■■■ Much of appellants' argument under point of error number four asserts that the jury should have believed appellants' expert testimony over the testimony offered by Tennessee. Appellants' credibility challenges are a matter for the factfinder and will not be considered as the basis for reversal by this Court. *See Turner v. Lone Star Indus., Inc.*, 733 S.W.2d 242, 246 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

■■■ Our review of the jury charge indicates that appellants chose to submit only one issue to the jury concerning a breach of contract cause of action against Tennessee. On appeal, in point of error nine, appellants raise a new theory of contractual liability for the first time—breach of "lessee obligations" by Tennessee after January 1, 1987. This theory was never pled, never argued at trial, and never submitted to the jury or the court. A party will not be permitted to take a position on appeal that is not presented in the trial court. *See, e.g., Miner–Dederick Constr.*

*Corp. v. Mid–County Rental,* 603 S.W.2d 193, 198–99 (Tex.1980). An issue not expressly presented to the trial court cannot be considered on appeal as grounds for reversal. *Millhouse v. Wiesenthal,* 757 S.W.2d 103, 107 (Tex.App.—Houston [1st Dist.] 1988), *aff'd,* 775 S.W.2d 626 (Tex. 1989). Point of error nine is overruled.

### Jury Findings on Tennessee's Affirmative Defenses

In answers to questions 4A through 4E and question number 11, the jury found that appellants' contractual claims, if any, against Tennessee, were barred by payment, waiver, estoppel, laches, and novation. These affirmative defenses bar any contractual claims against Tennessee as a matter of law. *See, e.g., Wright Way Constr. Co. v. Harlingen Mall Co.,* 799 S.W.2d 415, 422 (Tex.App.—Corpus Christi 1990, writ denied). Point of error five claims the trial court erred in not holding that appellants are entitled to be paid by Tennessee for Tennessee's failure to take or pay appellants' royalty share of the contract quantity of gas, or for deficiencies in payments below the contract price, and in failing to disregard the jury's answer to question 4A that Tennessee's obligation to appellants under the contract had been paid by Tennessee. Point of error six states that the trial court erred in not holding that the evidence is legally or factually insufficient to support the finding that the settlement agreement between Hamman and Tennessee constituted a novation of the gas purchase contract with respect to the sale of the royalty gas and in failing to disregard the jury's answer to question number 4E, to this effect. Points of error 13, 14, and 15 maintain that the court erred in failing to disregard the jury findings that appellants waived their rights under the gas purchase contract with Tennessee; that the actions of appellants constituted laches; and that the actions of appellants constituted estoppel.

■ Evidence presented at trial supported the jury's finding that Tennessee's obligation to appellants under the gas purchase contract, if any, were paid by Tennessee. The evidence was undisputed that Tennessee paid $8,000,000 to settle all claims arising out of the reserves and the contract that were the subject of appellants' claims against Tennessee. The language of the settlement agreement itself reflects that payment by Tennessee was for all outstanding obligations under the gas purchase contract.

■ The jury's findings that appellants' claims, if any, against Tennessee were barred by the doctrines of waiver, laches, and estoppel are supported by appellants' own testimony that they failed to contact or communicate with Tennessee concerning their alleged rights under the gas purchase contract, even after they received the contract, for a period of approximately seven years.

■ Our review of the record demonstrates that there was sufficient evidence to support the jury's finding that Hamman had authority to settle appellants' claims, if any, against Tennessee in the settlement agreement. Appellants testified that Hamman was their agent and representative with respect to negotiations and transactions concerning their royalty interests and asserted in their first amended original petition that Hamman was obligated to represent appellants' interest in the Hamman–Tennessee lawsuit.

■ Finally, the evidence was sufficient for the jury to find that the settlement agreement acted as a novation of the gas purchase contract. The essential elements of a novation are (1) a previous, valid obligation; (2) an agreement of the parties to a new contract; (3) the extinguishment of the old contract; and (4) the validity of the new contract. *Siegler v. Telco Leasing, Inc.,* 593 S.W.2d 850, 852 (Tex.Civ. App.—Houston [1st Dist.] 1980, no writ). Testimony from representatives of Hamman and Tennessee demonstrated that the intent of the seller, Hamman, and of the buyer, Tennessee, was that the previous obligations of Tennessee arising under the gas purchase contract were to be released and extinguished in favor of the new obligations of Tennessee under the settlement

agreement. The evidence was sufficient for the jury to conclude that the settlement agreement was a valid agreement that is presently in effect. Points of error five, six, seven, 13, 14, and 15 are overruled.

Hamman's Obligations under the Lease

In point of error eight, appellants contend that if, for some reason, they are not parties to the gas purchase contract, then it was Hamman's obligation to make them parties. This obligation allegedly arises from paragraph three of the leases that imposed on Hamman the duties to reasonably market the production and to account to the plaintiffs for the royalty share of production upon the basis of the same price received by Hamman for the sale of that production. In questions number 5 and 6A, the jury found that Hamman met those obligations. Appellants contend, however, that as a matter of law, the answers should have been the opposite and that this Court should render judgment against Hamman for the $1,650,548 of Tennessee's take or pay deficiencies attributable to appellants' royalty share.

In order to sustain this point of error, this Court must find that the evidence supported the proposition that Hamman breached its marketing duties. In fact, the evidence supported the opposite conclusion. William Mandell and Field agreed that the contract was a wonderful contract; Mr. Hamman said he got the best possible contract; and Mr. Hamman got the highest possible price for the gas and received the three things that paragraph 3(c) of the leases obligated him to obtain, a favored nations provision, annual price redetermination, and prices based on MMBtus. Hamman paid appellants for all gas that was sold to Tennessee, a royalty sum exceeding one million dollars.

The marketing provisions of the leases underlying point of error eight all contain the word "production." The producer must "exercise its best efforts to obtain the most favorable market outlet for such *production*." The lessee "shall use reasonable diligence to market all *production* under

the best possible terms and conditions." (Emphasis added.) The lessee:

> shall account to Lessor for his royalty share of the *production* covered by such approved contract on the basis of the same price received by Lessee for the sale made under such contract.

(Emphasis added.)

Under Texas law, Hamman had these obligations even if they were not stated in the lease. In the case of *Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 567 (Tex.1981), the Texas Supreme Court listed the implied covenants in an oil and gas lease—to develop the premises, to protect the lease from drainage, and to market the production in the most prudent manner. The supreme court held that the operator must do everything reasonably possible to prevent drainage. The measure of damages for breach of the drainage covenant was the royalty interest on the production lost by the producer's failure to prevent drainage.

A lessee's covenants to its lessors pertain to *production* of gas. *See, e.g., Cabot Corp. v. Brown*, 754 S.W.2d 104 (Tex.1987); *Amoco*, 622 S.W.2d at 567. Under the drainage covenant, the lessee must assure that gas that *could be produced* is not drained off to another well. Under the development covenant, the lessee must do whatever is reasonably necessary to make sure that the lessor's gas gets out of the ground. Under the marketing covenant, the lessee must make certain that *gas that is produced* is sold for the best price or under the best terms.

*Take or pay is not a payment for production; it is a payment for nonproduction. Killam Oil Co. v. Bruni*, 806 S.W.2d 264, 268 (Tex.App.—San Antonio 1991, writ denied). The purpose of a take or pay clause is to apportion risks of natural gas production and sales between the buyer and seller. The seller bears the risk of production, and the buyer agrees to take, or pay for if not taken, a minimum quantity of gas. The buyer bears the risk of market demand. The take or pay clause insures that if the demand for gas decreases, the seller will still receive the price for

the contract quantity delivered each year. *Universal Resource Corp. v. Panhandle E. Pipe Line Co.*, 813 F.2d 77, 80 (5th Cir.1987). A take or pay payment that comes before gas is actually produced and taken cannot be a payment for the sale of gas.

Production is the key to royalty. *See Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159, 1167–68 (5th Cir.1988). Royalty does not accrue until gas is produced, that is, physically severed from the soil. *See Exxon Corp. v. Middleton*, 613 S.W.2d 240, 242 (Tex.1981); *Monsanto Co. v. Tyrrell*, 537 S.W.2d 135, 137 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). We hold that take or pay is not a benefit that appellants received via execution of the lease with Hamman and does not flow from the marketing covenant of the lease. Hamman was required to obtain for appellants only benefits received that were related to the sale of gas that had been produced. Point of error eight is overruled.

### Jury Findings on Apportionment of the Settlement

Points of error 10, 11, and 12 relate to jury questions 12 and 12A. Jury question 12 states, with the jury findings:

Of the $8,000,000 settlement Hamman received from Tennessee, how much money should be allocated to each of the following:

a. Sale of the leases from Hamman to Tennessee?

$6,500,000.

b. Settlement of take-or-pay claims against Tennessee?

$626,000.

c. Settlement of pricing and drainage claims against Tennessee?

$874,000.

Jury question and the jury's finding on question 12A are:

What percentage of the settlement Hamman received from Tennessee is attributable to Hamman's claims under Contract No. 888 [gas purchase contract]?

ANSWER: 13.9%

The jury found that $874,000 of the settlement pertained to claims for drainage and pricing. Appellants' royalty share of that amount was ⁵⁄₃₂. That fraction was multiplied again by 13.9 percent, which the jury found was the portion of the settlement that related to the gas purchase contract. The result is $18,982, the amount awarded to appellants by the judgment.

Appellants argue in points of error 10, 11, and 12 that there is no evidence to support the jury's finding that the leases should be valued at $6,500,000 and contend that this Court should hold, as a matter of law, that the value of the leases is $2,192,-632 and that $4,934,000 is the amount recovered by Hamman from Tennessee for take or pay deficiencies. Appellants claim their share should be $4,934,000, multiplied by ⁵⁄₃₂ and multiplied again by the portion of the settlement allocated to the gas purchase contract. Appellants argue, in point of error 12, that the court erred in failing to disregard the jury's answer to question number 12A, urging us to hold that the evidence was legally or factually insufficient for the court to enter judgment on the jury's finding that 13.9 percent of the settlement proceeds received by Hamman from Tennessee should be allocated to the claims of Hamman Oil under the gas purchase contract.

Our review of the record demonstrates that Whitworth, appellants' expert, stated that the percentage of the settlement attributable to Hamman's claims under the gas purchase contract was 13.9 percent, as found by the jury in question 12A. As for the value of the leases, both sides offered evidence about estimates of the amount of gas reserves at the time of the Hamman–Tennessee settlement. Goodwin, Hamman's engineer who valued the reserves at the time of settlement, valued the leases at $6,500,000, as the jury found. Whitworth valued the leases at $2,200,000. Freedenthal, appellants' witness, testified that the proper valuation of the reserves was the contract price, which would amount to $6,500,000. We hold that the evidence was legally and factually sufficient for the court to enter judgment that

the sale of the leases should be valued at $6,500,000 and that appellants were not entitled to any portion of this amount.

Since the $6,500,000 and the $874,000 in jury question number 12 are supported by the evidence, the remainder of the $8,000,000, the jury's finding that the proper valuation of the settlement of take or pay claims was $626,000, was correctly determined by the jury. In an earler partial summary judgment, the trial court entered partial summary judgment that appellants had no claim for Hamman's take or pay recovery. The only other basis for the royalty owners to recover the take or pay portion of the settlement would be under the marketing clauses in the leases. As previously discussed in this opinion, the jury found Hamman complied with those provisions, and sufficient evidence was offered to support the jury findings.

Appellants are, therefore, entitled to no more of the settlement than the judgment awarded them, or the royalty share of $874,000, which is $18,982. Points of error 10, 11, and 12 are overruled.

### Award of Reasonable Attorney's Fees

 In point of error 16, appellants complain of the jury's answers to questions number 16 and 17, awarding $2,058.63 for attorney's fees. They ask this Court to reverse and render attorney's fees in the amount of $185,000 for services in the trial court, $25,000 in the court of appeals, and $7500, in the event that a writ of error is filed with the supreme court. We decline to do so.

Appellants assert that the jury must accept as binding the uncontradicted testimony of their attorney, Brantly Harris, about the reasonableness of his fees. The reasonableness of attorney's fees, however, is a matter for the jury's determination. *Tarleton State Univ. v. K.A. Sparks Contractor, Inc.*, 695 S.W.2d 362 (Tex.App.—Waco 1985, writ ref'd n.r.e.). The trier of fact may determine the credibility of the witness and accept or reject his expert opinion testimony in whole or in part. *Bethel v. Butler Drilling Co.*, 635 S.W.2d 834, 839-40 (Tex.App.—Houston [14th

Dist.] 1982, writ ref'd n.r.e.). We find the evidence was legally and factually sufficient to support the award of $2,058.63 for attorney's fees. Point of error 16 is overruled.

Appellee Hamman Oil Company aserts, in a single cross point, that this Court should assess costs against appellants under rule 84 of the Texas Rules of Appellate Procedure, because this appeal is frivolous. We overrule appellee's cross point of error.

The judgment of the trial court is affirmed.