Eddie G. **HINTON and Others Similarly Situated, Plaintiff,**

v.

**FEDERAL NATIONAL MORTGAGE ASSOCIATION, et al., Defendants.**

**Civil Action No. H–96–2070.**

United States District Court, Southern District of Texas.

Nov. 14, 1996.

Richard J. White, Buckley, Mathews and White, Houston, TX, for Plaintiff.

Philip J. John, Jr., Jennifer M. Smith, Baker & Botts, Houston, TX, Jacqueline R. Denning, Kenneth I. Juster, Jay Kelly Wright, Arnold and Porter, Washington, DC, for Defendant FNMA.

David J. Beck, Beck, Redden & Secrest, Houston, TX, for Defendant Magnolia.

Opinion on Judgment

HUGHES, District Judge.

1. *Introduction.*

A homeowner sued the current holder of his mortgage because it and its contract service agent required him to pay for private mortgage insurance when its internal guidelines said that it might have been waived. The homeowner's obligations are in the mortgage instruments he signed, not the mortgage lender's service guide.

2. *Background.*

In 1977, Eddie Hinton borrowed the purchase price of a house in Houston from North American Mortgage Company. To secure its loan, North American took a mortgage through the usual deed of trust. Shortly after having originated the loan, North American sold Hinton's mortgage to the Federal National Mortgage Association (FNMA).

In 1988, the right to manage Hinton's mortgage for FNMA was sold to Litton Mortgage Servicing Center, who sold the contract to Magnolia Federal Bank for Savings in 1993. Since 1993, Magnolia has been FNMA's agent for Hinton's mortgage. Magnolia requires from Hinton what the mortgage itself obligates him to do, and it conducts itself under FNMA's servicing guide.

As a servicing agent, Magnolia was responsible for collecting the homeowner's payments and disbursing them at the direction of its principal; FNMA owned the loan. The service rights and the loan have not been held by the same entity since North American first sold the loan. Part of these payments were held in an escrow account. From there, Magnolia paid Hinton's real estate taxes, homeowner's insurance, and private mortgage insurance. The principal and interest, less the agent's fee, were sent to FNMA.

FNMA is a federally chartered corporation created to allow liquidity and diversification for holders of home mortgages through a secondary market. FNMA buys mortgages from original lenders becoming the holder of the note. To keep its administrative operation flexible, FNMA hires mortgage servicers like Magnolia to handle the maintenance of the account.

3. *Private Mortgage Insurance.*

Private mortgage insurance covers credit risk; lenders obtain it to reduce their liability when borrowers default. The most common form of mortgage insurance in America has been the loan guaranties of veterans' loans by the government. The Federal Housing Administration had a similar program for borrowers who were not veterans. With the rise in the secondary market for mortgages, nongovernmental insurers expanded to cover other segments of the business.

As a consequence of government regulations, the cost of mortgage insurance is a separate item on the loan disclosure to the borrower. The terms of its payment are clearly specified in the deed of trust and other papers the borrower signs.

In a typical policy, for a premium of one-quarter of one percent of the loan balance, the upper twenty percent of the principal is insured. The level of coverage is determined by the market's estimate of the likely difference between the net recovery from foreclosure and the debt.

Whether a lender requires mortgage insurance as part of its conditions for the extension of credit depends on the lender's needs. In its standards for loans, FNMA requires the insurance as a condition for its purchase of the loans in the secondary market. Private mortgage insurance is not mandated by federal or state law. Because the value of a mortgage is dependent of local real estate prices and actual maintenance practices of individual borrowers, mortgage insurance allows for those variations more cheaply than loan-specific research by the purchasers in the secondary market.

Although lenders "charge" the borrower for mortgage insurance premiums, the lender is the insured, not the borrower. If the borrower defaults, he is not protected at all by the mortgage insurance because, after paying the lender's claim, the insurer may sue the borrower on the note.

Between FNMA and its loan servicers, FNMA has an internal policy that a servicer must cancel mortgage insurance on a borrower's request when the current loan-to-original value ratio is 80% or less. In other words, when a mortgagor accumulates an equity of 20% and when the borrowers asks, FNMA will waive the requirement of mortgage insurance.

4. *Claims.*

Hinton raises two claims:

- FNMA and Magnolia have kept requiring Hinton to pay mortgage insurance despite their policy to waive that requirement on demand when the 80% loan-to-value ratio has been reached.

- FNMA and Magnolia have not notified Hinton of this policy so that he could demand cancellation in violation of consumer protection statutes.

*5. Hinton's Contract.*

█ Hinton applied to North American for a loan to purchase his home in April 1977. As a condition of the loan, North American required him to maintain mortgage insurance for the entire term of his mortgage. At closing on June 14, 1977, Hinton signed these three documents acknowledging his obligation to maintain mortgage insurance for the life of his loan:

- statement of cost of the loan;
- premium payment authorization; and
- deed of trust.

The statement of loan cost lists the cost of "private mortgage insurance premium *over* [the] *full term of loan*" as $2,760.63. (emphasis added). The statement clearly says that the mortgage insurance "premium is paid *over a period of 360 months* and is included in monthly payments. The first is due August 1, 1977 in the amount of $10.34 and the last one is due July 1, 2007 in the amount of $0.99." (emphasis added). The mortgage insurance premium is a percentage of the outstanding principal, declining over the life of the loan.

The separate premium payment authorization signed by Hinton authorizes the lender to obtain mortgage insurance and requires Hinton to pay for it for the life of his loan:

> North American Mortgage Company, mortgagee, may, at *any time during the mortgage term,* and at its discretion, apply for renewal of mortgage loan insurance covering the mortgage, ... pay the premium due ..., and require repayment by [Hinton] of such amounts as are advanced by said mortgagee. (emphasis added).

Two provisions in Hinton's deed of trust also require him to maintain mortgage insurance for the life of his loan. They say:

> 2. Funds for taxes and insurance. Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly installments of principal and interest are payable under the Note, *until the Note is paid in full,* a sum ... equal to one-twelfth of the ... yearly premium installments for mortgage insurance, if any ...;

. . . .

> 7. Protection of Lender's Security. If Lender required mortgage insurance as a condition of making the loan secured by this Deed of Trust, Borrower shall pay the premiums required to maintain such insurance in effect *until* such time as *the requirement for such insurance terminates* in accordance with *Borrower's and Lender's written agreement* or applicable law.

(emphasis added). Hence, there was no contractual or statutory obligation to cancel private mortgage insurance at any time. *See, e.g., Wright v. Associated Ins. Cos., Inc.,* 29 F.3d 1244, 1248 (7th Cir.1994) (contract and public documents can be considered on a rule twelve motion without conversion to a summary judgment motion).

*4. Servicing Guide.*

The guide is not law. FNMA's servicing guide, a policy manual that FNMA furnishes to companies like Magnolia to assist them in meeting FNMA's needs, is not contractually part of FNMA's relation to Hinton. Because Hinton borrowed the money from North American, the terms of his contract were fixed in the papers before FNMA joined the deal; FNMA simply bought Hinton's obligations under the existing mortgage as originated by North American. FNMA represented nothing to Hinton about principal, interest, casualty insurance, mortgage insurance, ad valorem taxes, nor closing costs.

The specific provisions that Hinton relies on are where the guide says:

> A. Cancellation based on original value. When borrower-purchased mortgage insurance coverage is canceled based on the original value of the property, the cancellation may result from the servicer's use of procedures that provide for automatic cancellation under certain conditions or from the mortgagor's request to have the coverage canceled.

> Servicers *may automatically* cancel borrower-purchased mortgage insurance coverage for a current *first* mortgage when the unpaid principal balance of the mortgage has been paid down to 80% of

the *original* value of the property, unless the servicer thinks that the property may have depreciated in value since the original appraisal

Servicers generally *must* cancel borrower-purchased mortgage insurance coverage for a current mortgage if the mortgagor requests that it be canceled and the unpaid principal balance of a first mortgage has been paid down to 80% of the *original* value of the property....

In addition, if the servicer believes that it is necessary to assure that the property has retained its value, the servicer may require the mortgagor to submit a current appraisal for the property before it cancels the coverage.

(emphasis org.). Despite the density of its text, it is clear that the decision to waive mortgage insurance is discretionary in the interest of the holder because of the additional requirement of a current appraisal in addition to the loan-to-original value. Far from automatic, the waiver involves a credit-risk judgment.

### 6. *Contract.*

By the language of the guide the servicer must cancel only when the mortgagor has acquired a 20% equity and made a request. In oral argument, Hinton's counsel did not know whether he had achieved the required ratio, and they concede that the only request he made was through the original complaint in this action. For this opinion, it is assumed that rudimentary preparation would indeed show that Hinton has the equity and that this lawsuit is fairly a contractual request.

The guide is a set of instructions from a lender-principal to a servicer-agent; it is not a contract between borrower and lender. Hinton's relation to Magnolia derives from two contracts. He owes Magnolia what he owes FNMA because FNMA has a contract authorizing Magnolia to do FNMA's collecting and disbursing under the Hinton–FNMA contract. FNMA is the only one that can question Magnolia's lack of adherence to the guide.

Without a contractual obligation, FNMA has no duty to reduce Hinton's overall mortgage cost nor disclose its own internal operating procedures any more than the IRS, for example, has a duty to give tax advice. While we could reduce unnecessary taxation by knowing each and every loophole in the tax code, the IRS need not tell us and need fear no reprisal for its silence.

The "right" to cancel private mortgage insurance that Hinton asserts does not arise from a contractual or other legal duty. FNMA made a business decision to give borrowers the option to cancel private mortgage insurance early, despite the fact that the mortgage contract did not provide for early cancellation.

Under the terms of the deed of trust, Hinton is contractually obliged to pay mortgage insurance premiums until his note is "paid in full," until the requirement for mortgage insurance is waived by the lender, or until termination is required by law. Hinton does not contend that these events occurred, and none has. All the agreements Hinton signed specify that he must maintain insurance for the entire term of his mortgage.

### 7. *Third–Party Beneficiary.*

█ Assuming the guide created a contract between FNMA and Magnolia, Hinton asserts that he is a third-party beneficiary of the early cancellation provisions, entitling him to enforce that clause. Because the clause contemplates discretion, it creates no rights. Assuming that the provision were worded as Hinton's wishes it were, he is neither the contemplated object of the guide nor is he benefited by it.

FNMA does not make loans to borrowers; instead, FNMA purchases loans from lenders after the loans are made to borrowers to facilitate the flow of private capital into housing. FNMA does not service the loans it purchases; that function is performed by institutions in the primary mortgage market, like Magnolia, that contract with FNMA. FNMA enters into a standard "mortgage selling and servicing contract" with each primary-market lenders that sell to or service for FNMA.

█ A third-party beneficiary is not a direct party to the transaction by definition; it is a semi-related entity that intrudes to

claim benefits of the contract. Texas law imposes a heavy burden on a person claiming to be a third-party beneficiary. A third party cannot bring a contract action unless he shows that the contract was actually made for his benefit and that the parties intended the contract to be for the third party's benefit. The contract will not be interpreted as having been made for the third party's benefit unless it clearly appears that was the intention of the parties to the contract. Any doubt is resolved against finding that a party was intended to be a third party beneficiary. *See Mandell v. Hamman Oil & Ref. Co.,* 822 S.W.2d 153 (Tex.App.—Houston [1st Dist.] 1991, writ denied).

The contract between FNMA and Magnolia says that it does not create rights for borrowers. The manifest intent is just the opposite of Hinton's claim, for the guide says: "These rights and remedies are for *our benefit* and that of *our successors and assigns.*" (emphasis added). No intent to benefit Hinton is manifest in the contract between FNMA and Magnolia. The service guide is at most a supplement to the service contract. If Hinton is not the intended beneficiary of the principal contract he is not a beneficiary of the subsidiary part.

The service guide, of course, is not a contract; while FMNA expects servicers to rely on it in acting in its business, FNMA retains the power to change its procedures unilaterally. FNMA's current policy of not having servicers enforce deed-of-trust requirements for private mortgage insurance does not modify Hinton's contract or give him a right to cancel his mortgage insurance obligation.

■ By way of comparison, courts have rejected a borrower's claim that he was a third-party beneficiary of a Housing and Urban Development (HUD) handbook which, like the FNMA servicing guide, established guidelines for servicers of HUD mortgages. *See Roberts v. Cameron–Brown Co.,* 556 F.2d 356 (5th Cir.1977). The court found:

> HUD did not promulgate the Handbook for the especial benefit of Section 235 mortgagors.... HUD designed the handbook for HUD-approved mortgagees in servicing HUD-insured home mortgages, as the Handbook itself states.

*Id.* at 360. The court held that, at most, the borrower was an incidental beneficiary who had no cause of action. Incidental beneficiaries may not sue on a contract. *Mandell,* 822 S.W.2d at 161.

### 8. *Gift.*

■ Hinton says that FNMA gave a spontaneous boon to homeowners when it decided to institute the policy to cancel private mortgage insurance, making the new policy a gift, ignoring that it could change its policy at any time and that Hinton's loan could be sold to another secondary-market investor with a different policy.

■ If a contract's performance comes as a pure donation to a third party, then the third party may enforce the contract as a donee-beneficiary. *See Republic Nat'l Bank v. Nat'l Bankers Life Ins. Co.,* 427 S.W.2d 76, 80 (Tex.Civ.App.—Dallas 1968, writ ref'd n.r.e.). Three elements are necessary to establish a gift: (a) present intent to make a gift; (b) delivery of the property; and (c) acceptance of the gift. *In re Estate of Hamill,* 866 S.W.2d 339, 344 (Tex.App.—Amarillo 1993, no writ); *see also Wells v. Sansing,* 151 Tex. 36, 245 S.W.2d 964 (1952).

The law of donee-beneficiaries does not apply because the Magnolia–FNMA contract had a substance independent from the gift to Hinton. The gift is too inextricably woven among the duties of the servicer to be a "pure" anything.

■ Assuming that FNMA had a present intent to donate its contract rights to Hinton, it never delivered the property. A gift is not a promise; it requires both intent to make a present gift and delivery or other transfer of the property accomplishing the intent. *Thornton v. Rains,* 157 Tex. 65, 299 S.W.2d 287, 288 (1957). For a gift to be effective, possession of chattels must shift from the donor to the donee with donor's manifest intent to vest ownership in donee immediately and unconditionally. *Oadra v. Stegall,* 871 S.W.2d 882, 890 (Tex.App.—Houston [14th Dist.] 1994, no writ). The existence of this suit contradicts delivery; Hinton is saying, "FNMA promised. Now make it deliver." In other places in his

papers, Hinton complains that FNMA made him a promise in its guide and that it was wrong for FNMA not to tell him about the promise. An uncommunicated promise of an undelivered gift is nothing.

### 9. *Trade Practices.*

 Hinton's alleges that FNMA failed—directly or through Magnolia—to inform him about the possibility of canceling mortgage insurance. That was true, but it is not actionable under Texas's consumer protection statutes. Because Hinton expressly agreed to pay mortgage insurance for the life of his loan, he suffers no injury from having to live up to his bargain. *See* TEX. BUS. & COM.CODE ANN. § 17.50(a) (DTPA action requires actual injury). FNMA cannot possibly have injured Hinton by failing to inform him of a contract right that he did not possess. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 161 (Tex.1995) (express "as is" in sales contract precludes finding that seller caused buyer's injuries); *Griffith v. Levi Strauss & Co.,* 85 F.3d 185, 187 (5th Cir.1996) (retailer fails under DTPA for manufacturer's not informing him that of it allowed retailers, depending on the circumstances, to wholesale merchandise where retailer's contract forbade wholesale).

In addition to his not being injured by FNMA's not waiving a term of his contract, Hinton can point to no part of his mortgage deal that generates a claim that the lender did not do what it promised in the loan documents in 1977. Hinton agreed to pay mortgage insurance whether it was "necessary" in some transcendental sense.

### 10. *Phantom Insurance.*

Although the result might well be the same, this case does not involve an included charge for a specific cost that the lender never actually incurs. In this case, FNMA used the premium it collected to buy third-party mortgage insurance.

It could have decided that it would be better to collect the premium as additional revenue and, rather than buying insurance, to used the "premium" fund to cover its actual loan loss experience. The effect of the need for credit risk insurance to compensate for lack of local information or diverse portfolio is to increase the cost of the mortgage to the borrower. In the absence of regulations, the total cost of the loan could be stated in the interest rate. Part of the interest collected by FNMA goes to pay its rent, salaries, advertising, uninsured credit losses, expectation of inflation, computer operations, and the endless list of ordinary operating expenses. Whether its occupancy costs are higher or lower than its expectancy when it buys a loan, FNMA must live with the deal it made at the time. It wins some, loses some. The borrower's obsessing about FNMA's internal "need" for mortgage insurance would be as well placed as if he were concerned with its excessive occupancy expenses.

### 11. *If Any.*

 Hinton claims that the phrase "if any" in his deed of trust confirms that mortgage insurance may be collected only if it is still required. Hinton is wrong. "If any" merely recognizes that payment of mortgage insurance premiums may not have been required by the lender in the origination of the loan. The document says that mortgage premiums will be collected if there is mortgage insurance. Hinton's mortgage is insured, and Magnolia collects premiums for FNMA. "If Lender required mortgage insurance as a condition of the loan secured by this Deed of Trust ..." the servicer will deduct the cost of that insurance. This wording allows the deed-of-trust form to be used both with loans that require mortgage insurance and with those that do not. There is nothing ambiguous about the wording; "if any" simply means "if the deed requires mortgage insurance." Standard loan documents are another feature of the rise of the secondary market.

### 12. *Fiduciary.*

 Hinton also claims that FNMA and Magnolia owed him the duty of a fiduciary derived from the escrow relation with Hinton. Ordinarily, each month servicers collect one-twelfth of the annual mortgage insurance premium, holding these amounts in an escrow account until the annual premium is paid. As an escrow agent, he argues, Mag-

nolia accrued special responsibilities once the money was deposited in an escrow account; assuming control over the funds, the servicer accepted the requirement that it disclose everything affecting his obligation to pay. Special agents as well as general agents have long been recognized in Texas law. *See Elliot Valve Repair Co. v. B.J. Valve & Fitting Co.,* 675 S.W.2d 555, 561 (Tex.App.—Houston [1st Dist.] 1984, rev'd on other grounds).

■ With respect to the operation of the escrow account, the servicer has a duty to conduct it as directed by the agreement between the parties in interest. An escrow account carries no global fiduciary responsibilities. As an escrow agent for premiums and taxes, Magnolia has the duty to safeguard, disburse, and account for funds properly. The disbursing agent's duties do not include securing the lowest insurance rate, the best terms, or the strongest company. *See Watkins v. Williamson,* 869 S.W.2d 383 (Tex.App.—Dallas 1993, no writ); *Trevino v. Brookhill Capital Resources,* 782 S.W.2d 279, 281 (Tex.App.—Houston [1st Dist.] 1989, writ denied) (escrow agent fiduciary to both parties to the underlying contract).

■ Payment of funds by the mortgagor into an "escrow" account for the mortgagee's use to meet tax and insurance obligations on the property as they accrue does not create a trust under Texas law. *Wesson v. Jefferson Sav. & Loan Ass'n,* 641 S.W.2d 903, 905 n. 2 (Tex.1982). Hinton admitted in oral argument that Magnolia did not misuse the funds in escrow, that all money escrowed for taxes, insurance, and special assessments were used for those purposes only. Magnolia's obligation under the mortgage was to receive the escrow payments, to retain them, and to apply them to the payment of insurance premiums, all of which Magnolia faithfully did. *See Umdenstock v. American Mortgage & Invest. Co.,* 363 F.Supp. 1375, 1379 (D.Okla. 1973).

Hinton had a collateral interest in the casualty insurance and tax payments because his obligation for those were independent of the mortgage; the mortgage insurance, however, is like the principal and interest. Also, the lapsing of casualty insurance could di-

rectly affect Hinton's residual interest in the improvements.

### 13. *Good Faith.*

■ Hinton contends that FNMA owes him a duty of "fair dealing." The legal duty of good faith and fair dealing appears to be a trendy cause of action in the nature of a pale fiduciary duty. It arises only in limited circumstances where a "special relationship" exists between the parties. *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987) (declining to imply a *covenant* of good faith and fair dealing in every contract). The law in Texas holds that the relation between a mortgagor and mortgagee does not give rise to a duty of good faith. *Federal Deposit Ins. Corp. v. Coleman,* 795 S.W.2d 706, 708 (Tex.1990).

■ Furthermore, as a federal instrumentality, FNMA cannot be held liable for the acts of servicers that it has not expressly authorized. *See Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384 n. 1, 68 S.Ct. 1, 3 n. 1, 92 L.Ed. 10 (1947).

### 14. *Actions & Parties.*

This case is the latest chapter in a series of lawsuits asking courts to rewrite mortgages. Hinton's lawyers must have read about the claim in the monthly issue of "Torts R'Us." Knowing of the pendency and resolution of several other suits, they brought this action for Hinton and all others similarly situated. Being unhappy with the removal to this court by the federal party, they attempted to abandon this suit and immediately filed it again in Alabama. They had heard that Magnolia had its principal office there, but in reality its principal office, as known to lawyers, is in Mississippi. Lured by the expectation of lucrative class-action fees, careless about facts and law, these lawyers roam around the country imposing costs on the parties defendant and on the economy as a whole. In these cases you can see vividly the price we pay as a nation for the invaluable benefit of an open system of courts.

Other courts have declined to create a cancellation right out of thin air and have held that standard deed-of-trust language on

mortgage insurance identical to Hinton's requires mortgage insurance for the life of the loan. *See, e.g., Siegl v. Twin City Fed. Mortgage Corp.*, No. CT 95–2306, slip op. (Minn. Dist.Ct. Nov. 14, 1995) (no claim against servicer that failed to disclose right to cancel mortgage insurance); *May v. Old Kent Bank & Trust Co.*, No. 95–2697–CK, slip op. (Mich. Cir.Ct. July 15, 1996) (upholding borrowers' contractual obligation to maintain mortgage insurance for the life of their loan).

15. *Conclusion.*

In his mortgage contract, Eddie Hinton agreed to pay mortgage insurance for the thirty years of his loan. Dissatisfied with this clear contractual obligation, Hinton asked the court to construe his mortgage contract and a separate agreement between FNMA and Magnolia—an agreement to which Hinton is neither a party nor an intended beneficiary—to give him the "right" to cancel his mortgage insurance.

Neither Hinton's mortgage contract nor the defendants' agreement provides Hinton a right to automatic cancellation of mortgage insurance when the unpaid principal balance of the mortgage has been paid to 80% of the original purchase price. Hinton's will take nothing by his request for a declaration that he has a right to cancel the mortgage insurance on his loan and that FNMA has a duty to cancel that insurance.