**Walter NORRIS, Jr.,**

v.

**HOUSING AUTHORITY OF THE CITY OF GALVESTON, et al.**

**Civil Action No. G–96–459.**

United States District Court, S.D. Texas, Galveston Division.

Nov. 3, 1997.

---

Johnetta Strange Cooper, Gordon R. Cooper, II, Cooper & Cooper, Houston, TX, for plaintiff.

Sam G. Tramonte, Robert E. Bastien, Tramonte, Tramonte & Bastien, Galveston, TX, John Edward Eckel, Mills, Shirley, et al, Barbara Elliott Roberts, City of Galveston, Office of City Atty., Galveston, TX, for defendant.

### *ORDER GRANTING SUMMARY JUDGMENT*

KENT, District Judge.

Plaintiff is the former Director of the Galveston Housing Authority ("GHA"). After he was terminated, Plaintiff filed suit against the GHA, Board of Commissioners of the GHA (the "Board"), Galveston Redevelopment and Community Enterprise Corporation ("GRACE"), and three individuals serving on the Board who voted to terminate

Plaintiff. In his Second Amended Complaint, Plaintiff alleges breach of contract and various violations of 42 U.S.C. §§ 1981, 1983, 1985. Now before the Court is Defendants' Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment. For the reasons set forth below, Plaintiff's Motion for Summary Judgment is **DENIED**, and Defendants' Motion for Summary Judgment is **GRANTED**. All of Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE**.

## I.  FACTUAL SUMMARY

This is a hotly contested case arising from the unsightly quagmire of Galveston public-housing politics.[1] The GHA, which was established in 1940 pursuant to the Texas Housing Authorities Law, TEX.LOC. GOV'T CODE ANN. §§ 392.001–392.104 (Vernon 1997),[2] is a tax-exempt subunit of government organized to provide adequate housing for limited income residents of Galveston, Texas. Indeed, like other housing authorities in Texas, the GHA is mandated by the Texas Legislature to "manage and operate its housing projects in an efficient manner to enable it to set rentals at the lowest possible rates consistent with providing decent, safe, and sanitary housing...." *Id.* § 392.004. The GHA is governed by a five-member Board, appointed by the Mayor of Galveston; these commissioners serve two-year terms and cannot serve more than six years total. *See id.* §§ 392.031, 392.034, 392.051(b). Although the Federal Department of Housing and Urban Development ("HUD") promulgates regulations and provides funds for GHA projects, the power and authority of the GHA actually stems from the enabling legislation of the State of Texas and the Mayor of Galveston. *See id.* § 392.004. Thus, the only authority the federal government has over GHA activities stems from the Annual Contributions Contract entered into between the GHA and the federal government, and signed each year by the Chairman of the Board. In that contract, the GHA agrees that accepting federal funds obligates the GHA to administer federal housing programs according to those regulations promulgated by HUD.

Section 8 of the Housing Authorities Act declares that a Housing Authority is a public body corporate and politic, exercising public and essential governmental functions. The GHA is also a business institution; it is empowered to acquire control over dwellings, housing accommodations, and properties, and operate the same in order to carry out the purposes of the Act. *See id.* §§ 392.004, 392.052. In pursuit of its mission, the GHA has acquired extensive properties in and around Galveston, including 1,394 public housing units which range from traditional low-income, family developments to a $5.9 million, 81,000 square-foot community center. The GHA has also at different times owned various tracts of undeveloped land in Galveston County, a warehouse, a maintenance shop, and 23 vehicles. Pursuant to its rent subsidy program, approximately 317 landlords participate with the GHA to provide 851 units of low-cost housing.

Plaintiff, an African–American male, entered a two-year employment contract with the GHA on April 14, 1988, whereby Plaintiff became the executive director of that body. *See id.* § 392.051(c) ("An authority may delegate a power or duty to an agent or employee as it considers proper."). As executive director, Plaintiff was responsible for the overall administration of GHA activities; in that capacity, he also served as secretary to the Board.[3] Specifically, Plaintiff's employ-

---

1. The submissions in this case are voluminous; when stacked they reach the knee. In their Motions for Summary Judgment alone, the parties have submitted over 1200 pages of supporting documents.

2. The Texas Housing Authorities Law, like most state public housing legislation, was stimulated by federal initiatives beginning with the Federal Housing Act of 1937. *See* 42 U.S.C. § 1437–1437z. This federal law was directed toward improving the housing conditions in the poorest areas of the United States. *See* § 1437. Pursuant to the Housing Act, federal housing funds were provided for states and municipalities and these entities were encouraged to create local housing agencies, like the GHA.

3. The Bylaws of the GHA provide that Plaintiff "shall have the care and custody of all funds of the Authority," and provide that "the executive director ... shall be charged with the management of the housing projects of the Authority." (GHA Bylaws, art. 2, § 5).

ment contract provided that he was to "keep all books and records as required" and "oversee and be responsible for the execution of all rules, regulations, and procedures."[4] By consent of both parties, Plaintiff's original contract was amended on five occasions; the last amendment extended Plaintiff's contract, providing that Plaintiff would serve the GHA as executive director until June 30, 1999. Two of the three Board members who ultimately voted for Plaintiff's termination were on the Board at the time of the last contract extension.

Besides giving the GHA the right to terminate Plaintiff for conviction of a felony or a crime involving moral turpitude, section 6.03 of Plaintiff's employment contract with the GHA provided:

> EMPLOYER may also terminate EMPLOYEE for misfeasance, non-feasance or for conduct that is *detrimental* to the best interest of the Authority, upon *good cause.* EMPLOYEE shall have the right to written charges, notice of hearing and a fair hearing before EMPLOYER'S Board, as required by due process. If EMPLOYEE chooses to be represented by legal counsel at any such hearing, he shall assume the cost of his legal expenses

(Plaintiff's Second Amended Complaint, at 3–4 (emphasis added)).

In late 1994, the then Mayor of Galveston began to express concerns regarding the scattered-site housing plan which Plaintiff alleges the GHA was using as an effort to decrease the density of, and to decentralize, public housing locations. At that time, the Mayor questioned the wisdom of the GHA's plan, stating that many neighborhoods were complaining about the poor planning and location of GHA properties. Thereafter, the Mayor called a "housing summit" and attempted to set an agenda for the GHA. In early 1995, local opposition to GHA policies and, in particular, to Plaintiff and his actions had devolved into a firestorm of controversy. This opposition was evidenced in several scathing articles appearing in Galveston's local newspaper which criticized the GHA and raised a number of valid concerns for public discourse regarding its activities.

Plaintiff alleges that in August of 1995 the Board reversed GHA's decentralization policy and began searching for ways to "buy out" his contract. Defendants argue that there was never such a policy at the GHA, and instead contend that because the GHA was rapidly becoming a hopeless mess, they began to question Plaintiff's competence and abilities. It is clear from the evidence that the Board then began discussions regarding the propriety of retaining a company to conduct an independent management review. In October, the Board approved such a measure. Thereafter, the services of Ventana Consulting Group were retained to conduct the management review. After determining that the procurement policies as provided by HUD had not been followed when hiring Ventana, the Board rescinded the contract with Ventana and recontracted, substituting GRACE [5] in place of the GHA.[6] The manage-

---

4. The contract provided Plaintiff with a $400 monthly car allowance and four weeks of paid vacation per year. Plaintiff was earning $79,-877.70 per year following the last contract amendment. The contract also provided Plaintiff with the opportunity for a sizable bonus.

5. GRACE is a nonprofit corporation incorporated under the laws of the State of Texas. It was apparently created to allow the GHA to perform certain activities, such as investing to raise revenue, which were believed to be beyond the role of the GHA as a public entity. *See* TEX.LOC.GOV'T CODE ANN. § 392.052 (describing the power and authority of a local housing authority). According to GRACE's articles of incorporation, GRACE's purpose is to provide "decent, safe and sanitary housing for persons of low income, elderly, handicapped, and/or disabled persons" and to "act as an instrumentality" of the GHA.

Members of the GHA Board also served as directors of GRACE corporation. In his efforts to attach liability to GRACE, Plaintiff alleges that GRACE is an alter ego or instrument of the GHA.

6. Plaintiff vehemently opposed the retention of Ventana to conduct an independent management review. Initially, Plaintiff argued that Ventana's efforts would be duplicative of those taken by the independent financial audit conducted each year. Then Plaintiff argued that the procedures used by the Board to retain Ventana were not in accord with HUD policy. Indeed, Defendants allege that, shortly after retaining Ventana, Plaintiff engaged in a letter writing campaign to HUD to end the management review. (Although Plaintiff denies that he was responsible for the mass of letters written to HUD, the Court notes that all were strikingly similar to a letter written to HUD by Plaintiff himself). Now, Plaintiff argues that

ment review conducted by Ventana allegedly took six months, and involved 120 interviews and the collection of 6,500 individual documents. The result of the management review of the GHA was scathing, impugning the performance of GHA management and the Board.[7] Some of the relevant findings reported in this 155 page document (exclusive of appendices) are reproduced here.[8] Ventana's findings included:

—GHA was not being run in a businesslike manner in regards to its finances and management, and had failed to develop goals and long-range plans. This lack of planning had resulted in inordinate losses of GHA monies.

—GHA management openly defied the Board and worked against the Board on several issues.

—GHA's staff was not open with the public about operations and had a defensive mentality. Moreover, the community had a negative attitude regarding the GHA. Many residents felt verbally abused and threatened by GHA staff, and it was perceived that other residents had been given special privileges because of their support of the GHA.

—Financial information presented to the Board was inadequate, unclear, incomplete, and if provided, not done so in a timely manner.

—The GHA had failed to pay ad valorem taxes on GHA properties, resulting in $20,000 of penalties.

—The GHA had failed to make payments and submit required documentation in contravention of the terms of one of its loan agreements.

—Sizeable business transactions had been initiated by the executive director without adequate financial planning.

—The GHA did not have adequate internal accounting controls.

—The GHA had no cash management and investment policy for excess cash funds, resulting in a revenue loss of between $75,000 and $100,000 over a three-year period.

—GHA funds, equipment, supplies, personnel, and office space had been used to support an organization called the Minority Leadership Council. This organization had been involved in many local political matters, including the appointment of a superintendent of the Galveston school district, realignment of school attendance zones, selection of a new president for Galveston College, and appointment of GHA commissioners. Moreover, GHA funds, equipment, office space, and supplies had been used to prepare and distribute a petition to recall the Galveston Mayor and a member of the Galveston City Council, to prepare and distribute form letters and petitions asking residents to express support for the Mayor to reappoint former Board members, to plan meetings to prepare a response to the City Council's reported intent to conduct a management review of the City, and to plan retaliation efforts against the Galveston Daily News for its negative coverage of City government issues.

—GHA credit cards had been used to pay for the travel expenses of former members of the Board, and spouses and children of

the way in which Ventana was retained demonstrates that a conspiracy existed and racial animus was involved because the independent management review was extremely critical of his management activities. The Court finds all such arguments utterly and totally devoid of merit.

7. The review stated that the "unless revitalized in the near term, it will be only a short time before the agency self-destructs."

8. Only three of the five commissioners cooperated in Ventana's management review. In the cover letter accompanying the review, the president of Ventana relates the difficulties experienced in conducting the review. As an initial matter, he asserts that the two dissenting Board members attempted to derail the review and GHA management was extremely uncooperative. He also contends that as work on the review proceeded, the reviewers became increasingly concerned about the integrity and accuracy of the financial records maintained by the GHA. This concern about the reliability of GHA documents caused the reviewers to spend considerable time collecting documents from those with which the GHA did business.

current members of the Board in contravention of GHA travel policies.

Following review and adoption of the Ventana Report by the Board, and pursuant to provisions of Plaintiff's employment contract, on July 1, 1996, the Board leveled fifteen charges against Plaintiff and placed him on administrative leave. Thereafter, on July 15, in accordance with Plaintiff's employment contract, Plaintiff, with assistance from his retained counsel, was given the opportunity to respond to these charges. After his opportunity to be heard, Plaintiff was immediately terminated by a majority resolution of the Board.

In his Second Amended Complaint, Plaintiff alleges four causes of action: 1) deprivation of rights and privileges under color of law allegedly committed by the GHA, the Board, and the commissioners in their individual capacities;[9] 2) conspiracy to violate civil rights allegedly committed by all Defendants; 3) deprivation of the right to enforce and enjoy contractual benefits allegedly committed by the GHA, the Board, and the commissioners in their individual capacities; and 4) breach of contract allegedly committed by the GHA, the Board and the commissioners in their individual capacities. Both sides·have moved for summary judgment.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. *See id.* at 248,

106 S.Ct. at 2510. The mere *existence* of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See id.* at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable factfinder could find in favor of the nonmoving party, summary judgment should not be granted. *See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Casualty Co.,* 799 F.Supp. 691 (S.D.Tex.1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

Procedurally, the party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2553; *see also* FED.R.CIV.P. 56(c). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *See Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Wise v. E.I. DuPont de Nemours & Co.,* 58 F.3d 193, 195 (5th Cir.1995). The Court must accept the evidence of the nonmoving party and draw all justifiable inferences in favor of that party. *See Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56. However, to meet its burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," but instead, must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 586–87, 106 S.Ct. at 1355–56 (quoting FED.R.CIV.P. 56(e)).

---

**9.** Plaintiff only sues those individual commissioners who voted to terminate him: Marc Cuenod, Christine Keller, and Alfreda Houston. He was terminated by a vote of 3 to 2.

### III. BREACH OF CONTRACT? [10]

A. *Can Plaintiff Maintain a Breach of Contract Claim Against the Board and the Members in Their Individual Capacities?*

Plaintiff alleges a cause of action for breach of contract against the Board, the GHA, and the three individual commissioners in their individual capacities who voted in favor of his termination. At the outset, the Court finds the allegations for breach of contract against the Board and the *individual commissioners* themselves to be pure nonsense. Plaintiff, like a good Galveston fisherman, casts a large net, apparently in an effort to snare and attach liability to all parties involved in the execution of the employment contract; however, in this case, that net has several gaping holes which preclude liability.

■■■ In Texas, it is an elementary rule of law that privity of contract is an essential element of recovery in an action based on a contractual theory. *See Mandell v. Hamman Oil and Refining Co.*, 822 S.W.2d 153, 161 (Tex.App.—Houston [1st Dist.] 1991, writ denied); *Hellenic Inv., Inc. v. The Kroger Co.*, 766 S.W.2d 861, 864–65 (Tex.App.—Houston [1st Dist.] 1989, no writ); *Major Inv., Inc. v. De Castillo*, 673 S.W.2d 276, 279 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.); *Citizens Real Estate & Mortgage Co. v. Sharp*, 246 S.W.2d 698, 701 (Tex.Civ. App.—Texarkana 1952, no writ) (declaring that there is no recovery for breach of contract without proof of the contractual relationship between the plaintiff and defendant). Indeed, except for third-party beneficiary and tortious interference theories, which are not alleged here, in order to maintain an action to recover for breach of contract, privity must exist between the party damaged and the party sought to be held liable. *See Mandell*, 822 S.W.2d at 161. No such privity exists in this case. Plaintiff's employment contract provides:

> This agreement to employ is made ... by and between THE BOARD OF COMMISSIONERS OF THE HOUSING AUTHORITY OF THE CITY OF GALVESTON, TEXAS, Galveston County, Texas, hereinafter called 'EMPLOYER', and WALTER NORRIS, JR., of Galveston, Galveston County, Texas, hereinafter called 'EMPLOYEE'.

(Plaintiff's employment contract, at 1).

■■■ In Texas, the language used by the parties to a contract should be accorded its plain grammatical meaning, unless it definitely appears the intention of the parties would thereby be defeated. *See Reilly v. Rangers Management, Inc.*, 727 S.W.2d 527, 529 (Tex.1987); *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex.1985). If the contract is worded so that it can be given a certain and definite meaning or interpretation, it is not ambiguous; therefore, the Court will construe the contract as a matter of law. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). In this case, the Court finds Plaintiff's employment contract to be clear and unambiguous. To even argue that the three individual Board members, who voted to terminate Plaintiff, entered the employment contract in their *individual* or *personal* capacities is absolutely ludicrous when such argument is viewed in light of the plain and unambiguous language in the employment contract. Moreover, such allegation fails the "smell" test. Nowhere within the contract

---

10. Defendants' primary argument in their Motion for Summary Judgment is that Plaintiff's employment contract is unenforceable under the Texas Constitution. The Court finds the constitutional provisions cited by Defendants nonapplicable in this case. The Court also considers the holding of *Kennon v. Schlesinger*, 182 S.W.2d 373 (Tex.Civ.App.—San Antonio 1944, writ ref'd w.o.m.). In that case, a terminated executive director of a housing authority sued on a "public office" theory for what was essentially specific performance of his two-year employment contract. Holding that the executive director position is a public office, the Kennon court found that the fixing of that position's term of office is a legislative function and the Board could not divest itself of its legislative power. Therefore, relying on *Crenshaw v. United States*, 134 U.S. 99, 10 S.Ct. 431, 33 L.Ed. 825 (1890), the court disallowed specific performance of the plaintiff's contract. Alternatively, considering the plaintiff's "breach of contract" theory, the court also disallowed specific performance, holding that the contract was personal in nature. The *Kennon* court, did, however, allow the plaintiff to pursue an action for breach of contract damages. *See Kennon*, 182 S.W.2d at 376. To that extent, *Kennon* controls the case at bar.

are the individual board members' names mentioned, and nowhere within the contract is it so much as intimated that the contract will even remotely benefit the members of the Board in their individual capacities. From a careful review of the pleadings and the executed employment contract, it is clear as a matter of law that the individual members of the Board were not acting in their personal or individual capacities when they negotiated and entered the contract of employment with Plaintiff, but instead were acting in their *official* capacities. Assuming some could be proffered, Plaintiff has presented absolutely no evidence whatsoever that challenges this conclusion. Therefore, to the extent that Plaintiff's cause of action alleging breach of contract is pursued against the three individual members of the Board who voted to terminate his employment, such cause of action is emphatically **DISMISSED WITH PREJUDICE.**

▪ When a plaintiff brings suit against a governmental official in his official capacity, that suit is essentially a suit against the government. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."); *Pickell v. Brooks,* 846 S.W.2d 421, 424–25 (Tex.App.—Austin 1992, writ denied) (citing *Herring v. Houston Nat'l Exch. Bank,* 113 Tex. 264, 253 S.W. 813, 814–15 (1923)). Thus, it follows that Plaintiff's cause of action against the Board, which is a term used to denote the individual members' official capacity, is in fact a cause of action against the GHA. It is, therefore, redundant as a practical matter for Plaintiff to sue the GHA and the Board for breach of contract. For purposes of *this* cause of action, these entities are one in the same. Thus, Plaintiff's breach of contract action against the Board is instead an action against the GHA.

▪ Moreover, the Court finds an additional basis which precludes any breach of contract liability of the Board or the individual commissioners in their individual capacities. In Texas, the general rule is that actions taken by an agent on behalf of the principal do not bind the agent. *See Holloway v. Skinner,* 898 S.W.2d 793, 795 (Tex. 1995) ("Corporations, by their very nature, cannot function without human agents. As a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts."); *see also Terry v. Zachry,* 272 S.W.2d 157, 160 (Tex.Civ.App.— San Antonio 1954, writ ref'd n.r.e.), *disapproved on other grounds in Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex. 1989).[11] The GHA is a subunit of government. *See* TEX.LOC.GOV'T CODE ANN. § 392.006 (noting that a housing authority's functions are essential governmental functions, not proprietary functions). As a governmental entity, the GHA may contract only upon express authorization of the Board, *i.e.,* by vote of that body as reflected in the minutes. *See Canales v. Laughlin,* 147 Tex. 169, 214 S.W.2d 451, 453, 455 (1948) (noting that legislatively created entities only have those powers as the Constitution itself or the statutes have specifically conferred upon them); *Corpus Christi v. Bayfront Assocs.,* 814 S.W.2d 98, 105 (Tex.App.—Corpus Christi 1991, writ denied); *Hill Farm, Inc. v. Hill County,* 425 S.W.2d 414, 418 (Tex.Civ. App.—Waco 1968), *aff'd,* 436 S.W.2d 320 (Tex.1969).

Similar to a Texas corporation in this regard, the GHA is a legal fiction. It can take no actions itself, but instead, must rely on its agents, here the Board, to enter contracts and conduct other business. From a plain reading of the Plaintiff's employment contract, it is clear that the Board entered the contract as an agent on behalf of the GHA; the Board, although acting for the GHA, was not itself a *party* to the contract. A contrary reading of the contract would mean that only the Board itself was a party to the contract,

---

**11.** From the documents submitted to the Court, it is clear that both parties understood that Plaintiff's contract of employment was with the GHA, not the Board or the individual members of the Board. As a practical matter, the Court notes that a suit against the Board, which is simply five commissioners acting in their official capacities (or put another way, five people acting collectively as an agent for the GHA), if successful, renders the same result.

because the GHA is not mentioned. Given the fact that Plaintiff worked for the GHA for over eight years pursuant to this contract, such an interpretation is downright silly. Because the employment contract is clear and unambiguous, the Court finds today that, except for the Plaintiff himself, the only other party to the employment contract is the GHA. *See Coker,* 650 S.W.2d at 393 (holding that a court may properly construe a contract as a matter of law when it is clear and unambiguous). The Board as an entity was not a party to Plaintiff's employment contract and cannot be liable pursuant to it. Therefore, to the extent that Plaintiff alleges breach of contract against the Board, such claim is hereby **DISMISSED WITH PREJUDICE.**[12]

*A. Plaintiff's Breach of Contract Action Against the GHA.*

1. A showing of good cause is required.

▇▇▇▇ It has been the law in Texas for over a century that all employees are presumed to be hired "at-will." *See Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733, 734 (Tex.1985) (noting that in 1888 the Texas Supreme Court held that "employment for an indefinite term may be terminated at will and without cause" and observing that "[t]he courts of Texas have steadfastly refused to vary from that holding."); *East Line & R.R.R. Co. v. Scott,* 72 Tex. 70, 75, 10 S.W. 99, 102 (1888). If there are no specific contract terms or express agreements to the contrary, the employment relationship may be terminated at any time by either the employer or employee. *See Duffy v. Leading Edge Products, Inc.,* 44 F.3d 308, 311 (5th Cir.1995); *Moulton v. City of Beaumont,* 991 F.2d 227, 230 (5th Cir.1993); *Federal Express Corp. v. Dutschmann,* 846 S.W.2d 282, 283 (Tex.1993); *Hauck,* 687 S.W.2d at 734; *East Line & R.R.R. Co.,* 72 Tex. at 75, 10 S.W. at 102. To overcome the at-will presumption, Plaintiff must establish that he and his employer had an enforceable

contract specifically depriving the employer of the right to terminate the employment relationship at will. *See Federal Express Corp.,* 846 S.W.2d at 283; *Hauck,* 687 S.W.2d at 734. In this case, Plaintiff's employment contract clearly states that Plaintiff could only be terminated under limited circumstances; therefore, the "at-will" presumption has been overcome.

▇▇▇▇ Besides giving the GHA the right to terminate Plaintiff for conviction of a felony or a crime involving moral turpitude, Plaintiff's employment contract with the GHA provided that the GHA could also terminate Plaintiff "for misfeasance, non-feasance or for conduct that is detrimental to the best interest of the Authority, upon good cause." [13] The issue of whether an employer had good cause to discharge an employee is a question of fact. *See Watts v. St. Mary's Hall, Inc.,* 662 S.W.2d 55, 58 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.). Moreover, the burden is on the employer to prove the existence of good cause. *See Advance Ross Electronics Corp. v. Green,* 624 S.W.2d 316, 318 (Tex.App.—Tyler 1981, no writ); *Langford v. Home for Aged Masons,* 617 S.W.2d 778, 780 (Tex.Civ.App.—Fort Worth 1981, no writ).

▇▇▇▇ Good cause for discharging an employee has been defined as the employee's failure to perform the duties in the scope of employment that a person of ordinary prudence would have done under the same or similar circumstances. *See, e.g., Sinsheimer v. Edward Weil Co.,* 61 Tex.Civ.App. 209, 129 S.W. 187, 188 (1910, writ ref'd). Moreover, an employee's actions constitute good cause for discharge if they are inconsistent with the continued existence of the employer/employee relationship. *See Lee–Wright, Inc. v. Hall,* 840 S.W.2d 572, 580 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Dixie Glass Co. v. Pollak,* 341 S.W.2d 530, 541–43 (Tex.Civ. App.—Houston 1960, no writ). Disobedience of reasonable rules of the employer that are

---

12. In his Second Amended Complaint, Plaintiff makes clear that he is not suing GRACE or its board of directors for breach of contract.

13. Texas law allows Board action upon a simple majority vote. *See* Tex.Loc.Gov't Code Ann.

§ 392.036 ("Unless the authority's bylaws require a larger number, when a quorum is present an authority may take action on a vote of a majority of the commissioners present.").

known to the employee has also been found to constitute just grounds for discharge. *See Swilley v. Galveston, H. & S.A. Ry. Co.*, 96 S.W.2d 105, 108 (Tex.Civ.App.—Galveston 1936, writ dism'd); *Robertson v. Panhandle & S.F. Ry. Co.*, 77 S.W.2d 1078, 1079 (Tex. Civ.App.—Austin 1934, writ dism'd). Insubordination and incompetence also warrant dismissal. *See St. Louis Southwestern Ry. Co. v. Hixon*, 104 Tex. 267, 137 S.W. 343, 346 (1911); *United Oil & Refining Co. v. Grey*, 47 Tex.Civ.App. 10, 102 S.W. 934, 935–36 (1907, no writ). Finally, there is an implied obligation on the part of an employee to do no act which has a tendency to injure the employer's business or financial interests, and a breach of this obligation will justify the employer in discharging the employee from his services. *See Watts*, 662 S.W.2d at 58; *Advance Ross Electronics*, 624 S.W.2d at 318; *Turner v. Byers*, 562 S.W.2d 507, 510 (Tex.Civ.App.—El Paso 1978, writ ref'd n.r.e.); *Wildman v. Ritter*, 469 S.W.2d 446, 448 (Tex.Civ.App.—Tyler 1971, writ ref'd n.r.e.); *Royal Oak Stave Co. v. Groce*, 113 S.W.2d 315, 317 (Tex.Civ.App.—Galveston 1937, writ dism'd).

■ While it is a question of fact whether there exist circumstances to show good cause for the discharge of an employee, if the discharged employee's misconduct is undisputed and the effect on the employer's business is clear, the question of good cause becomes one of law. *See Lee–Wright*, 840 S.W.2d at 580; *Watts*, 662 S.W.2d at 58; *Royal Oak Stave*, 113 S.W.2d at 317. In this case, prior to terminating him, the GHA leveled fifteen charges of misconduct and mismanagement against Plaintiff; these charges were taken directly from the comprehensive management review, the Ventana Report. At his termination, Plaintiff was given the opportunity to respond to these charges and he did so. In their Motion for Summary Judgment, Defendants cite these fifteen charges and add three more reasons which they contend constitute good cause for Plaintiff's termination. In his Motion for Summary Judgment, Plaintiff does not dispute the accuracy of each and every one of the charges against him; instead, Plaintiff concedes the truth of several of the charges, but then attempts to meekly explain and argue that his actions were not sufficient good cause for dismissal. Indeed, in his Response to Defendants' Motion for Summary Judgment, Plaintiff states: "As set out in Plaintiff's Motion for Summary Judgment, none of the charges leveled against Plaintiff constitute good cause for Plaintiff's termination." (Plaintiff's Response to Defendants' Motion for Summary Judgment, at 11). Because Plaintiff admits some [14] of the charges asserted against him, and because the business of the GHA is clear, this Court may determine whether those reasons proffered by Defendants and conceded by Plaintiff are sufficient, as a matter of law, to constitute good cause for Plaintiff's termination. *See Lee–Wright*, 840 S.W.2d at 580; *Watts*, 662 S.W.2d at 58; *Royal Oak Stave*, 113 S.W.2d at 317. After carefully reviewing the remarkably complete and voluminous summary judgment evidence in this case, the Court determines as a matter of law that overwhelmingly good cause existed for Plaintiff's termination. Moreover, even as to those charges which are disputed by Plaintiff, the Court finds the evidence to be overwhelmingly against the Plaintiff, such that no reasonable jury could rationally find that the Board lacked good cause to terminate him. *See E.E.O.C. v. Clear Lake Dodge*, 60 F.3d 1146, 1153 (5th Cir.1995) ("A motion for [summary judgment] should be granted where reasonable minds could reach only one conclusion on the evidence as presented." (citing *Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511 and *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc))).[15]

---

**14.** The Court not only considers those charges actually *conceded* by Plaintiff, but also those which are disputed. However, the Court does not determine those disputed issues, unless the evidence is such that no reasonable jury could find otherwise. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 (declaring that issues of material fact are "genuine" only if they require resolution by a trier of fact).

**15.** Although the Court finds only three Texas cases that actually describe the circumstances in which "good cause" becomes an issue of law, the Court observes that good cause, like any other fact issue, becomes an issue of law in two situations: 1) when the facts surrounding the discharge are not disputed, or 2) even when there is a factual dispute, when a reasonable jury could

2. Good cause exists as a matter of law.

■ According to his deposition, Plaintiff received a "management letter" from an independent financial auditor[16] hired by the GHA on December 13, 1995. Although the letter was addressed to both the Plaintiff and the Board, Plaintiff failed to inform the Board of the letter's existence and contents until over three months later, on March 25, 1996. Indeed, Plaintiff finally provided the letter to the Board only after a scathing article appeared in the Galveston County Daily News which discussed the letter and cast aspersions on the GHA. Defendants argue, and the Court agrees, that Plaintiff had ample opportunity to provide the Board with copies of the letter, because three intervening Board meetings were held after its receipt in which Plaintiff served as secretary. Defendants assert further that Plaintiff's obviously devious failure to provide the letter to the Board in a timely manner had a devastating effect on relations between the Board and Plaintiff.

Although Plaintiff contends in his Motion for Summary Judgment that the management letter contained nothing of importance and that it was therefore unnecessary to provide the Board with a copy, the Court wholeheartedly disagrees. The letter in question was a summary of an audit which contained eleven comments and suggestions regarding improvement of the GHA's financial operations; the contents of the letter raised genuine and extremely serious questions concerning the financial activities of the GHA and deserved immediate and concerted Board consideration. The letter included findings that: 1) cash forecasts of excess funds had not been evaluated, resulting in money losses because the monies had not been invested; 2) annual reports were filed late; 3) ledgers were inaccurate and lacked supporting detail; 4) bank statement reconciliation was two or three months behind schedule; 5) financial personnel were poorly trained; and 6) closeout procedures were conducted haphazardly. Plaintiff argues that because the letter only contained "sugges-

tions" and required no action by the Board, he did not need to inform them of its existence or contents. Any such suggestion is so asinine as to be logically insulting. No matter what term Plaintiff uses to describe the contents of the letter—"findings," "comments," or "suggestions"—any fair reading of it reveals that it was not complimentary of the financial activities of the GHA, and indeed, raised profound and far-reaching concerns. As executive director of the GHA, Plaintiff was directly responsible for the failures described in the letter. It was absolutely incumbent upon him to bring such matters promptly to the Board's attention. It is clear that the management letter reflected very poorly on the GHA and the Plaintiff specifically. Although the letter was addressed to Plaintiff and the Board, the Board did not receive a copy until after the local press had reported on the letter. Such failure manifestly violates the essential trust that should pervade the principal/agent relationship. *See West v. Touchstone,* 620 S.W.2d 687, 690 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.) (observing that "the relationship between an agent and principal is a fiduciary one"). The Court finds as a matter of law that Plaintiff's failure was at the very least against the best interests of the GHA and the citizens of Galveston County. At most, it was a deliberate attempt to withhold critical information and to deceive the Board as to matters of utmost importance. Plaintiff's failure to provide the letter is *alone* overwhelmingly sufficient good cause for his termination.

But, the list of horrors of Mr. Norris' remarkably self-serving conduct do not end there. GHA's travel policy provides that travel expenses are limited to "authorized persons ... traveling on approved official trips" and to "G.H.A. employees ... members of the Board ... and other persons authorized by the Board of Commissioners to act in G.H.A.'s behalf." GHA travel policy made abundantly clear that Plaintiff, as executive director, was not authorized to approve travel expenses to be charged to the GHA if

only reach one conclusion. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

16. Pursuant to the regulations of the Federal Department of Housing and Urban Development, an independent public auditor is retained to conduct a financial audit of the GHA each year.

those expenses contravened GHA policy. Plaintiff concedes, however, that on several different occasions he processed travel claims in direct violation of the travel policy. Indeed, according to the summary judgment evidence, more than fifty individuals traveled at GHA expense in less than a four-year period.[17] It appears to the Court that persons were traveling rampantly at taxpayers' expense with little or no accountability regarding reimbursement. Those traveling on the government dole included the wives and children of commissioners, and *former* commissioners and their wives and children.[18] In at least one case, GHA monies were used to provide child care for a GHA tenant. GHA's travel policy was implemented to prevent fraud and waste of governmental monies. Plaintiff does not dispute that he permitted this unauthorized travel, but instead, whines that the Board knew about it. The Court finds as a matter of law that such disobedience of official policy is good cause, which is again, in and of itself, sufficient to support Plaintiff's termination.

On November 16, 1994, the GHA received $109,732.35 at the closing of the purchase of the Port Holiday Apartments; $52,022.42 of those monies represented city taxes for 1994 and $11,190.35 represented county taxes for 1994. Plaintiff admits that instead of paying those taxes promptly, he inexplicably delayed, requiring the GHA to pay an additional $20,000 in penalties, interest, and collections fees on the city taxes alone. Plaintiff readily admits that he was responsible for ensuring that the taxes were paid; he concedes that he failed to pay these taxes in a timely manner. Such failure to pay taxes on time, especially when such failure required the GHA to pay over 30% more in penalties as a result, is rank incompetence and is again, even alone, clearly good cause for Plaintiff's dismissal, as a matter of law.

In early 1996, the GHA was sued in an effort to force it to disclose its records. At a Board meeting on April 22, 1996, Plaintiff was asked by the Board whether those documents requested had been provided; he admits that he answered affirmatively. Unbeknownst to the Board, Plaintiff had previously written to the Texas Attorney General, inquiring whether such documents were actually required to be disclosed under the Open Records Act. Following the meeting, Plaintiff again wrote to the Attorney General with the same inquiry. In his Motion for Summary Judgment, Plaintiff argues that there is no GHA policy which prevents executive director communication with the Attorney General. According to Plaintiff: *"As Chief Executive Officer for the GHA, Plaintiff was within his authority to request an opinion from the Attorney General."* The Court disagrees. Plaintiff was the executive director of the GHA. This position, by the clear terms of the employment contract and Texas statutes, is *subordinate* to the Board. It is not an appointed position. It is not an elected position. It is a position applied for and interviewed for by those who feel they qualify. Plaintiff was hired by the Board—his employer. His employer instructed him to produce the documents and he dishonestly stated that he had done so. He had not. Instead, he contrived to circumvent his instructions to do so even after their receipt, and without knowledge of the Board. To argue that he was never actually *told* not to speak to the Attorney General before writing the letters is absolutely ludicrous. Such an argument totally misses the point. When Plaintiff answered affirmatively that the documents were produced, but instead, retained the documents pending communications from the Attorney General, Plaintiff was clearly and unequivocally committing an act of deceitful insubordination. Such violation of the Board's trust is again, in and of itself and as a matter of law, good cause for his termination.

Although the Court will not herein discuss each and every one of the myriad of charges proffered by Defendants as good cause for Plaintiff's termination, the Court today holds

---

17. The number would be surprising if incurred by a traveling carnival. This number is even more shocking when viewed in light of the fact that there are only five members of the Board and one executive director.

18. Interestingly, only those commissioners who voted against Plaintiff's termination traveled in violation of the GHA's travel policy, and all such travel was approved by Mr. Norris.

that the summary judgment evidence in this case overwhelmingly supports a finding that the Board had good cause to terminate Plaintiff's contract. First, those actions committed by Plaintiff that he admits are, *each in and of themselves*, good cause for his termination as a matter of law. Additionally, a careful review of the summary judgment evidence reveals that such evidence is also overwhelmingly against Plaintiff on those allegations leveled by Defendants but disputed by Plaintiff. Like a tornado in a trailer park, Plaintiff's incompetence and mismanagement left the GHA a financial wreck. He apparently considered the GHA his personal fiefdom, and felt free to do as he darn well pleased, disregarding any rules or instructions he found personally inconvenient or offensive. His conduct was at best dumbfoundingly incompetent and at worst unbelievably deceitful, petulant and arrogant. The damage done by Plaintiff will take literally years to repair. During Plaintiff's tenure, two independent financial reviews found that there was considerable waste at the GHA and operations were inefficient. One of those reviews revealed that there was no formal process of planning used when undertaking major projects. Indeed, many demonstrate less competence than would be used by seven-year olds running a lemonade stand. Both the Ventana Report and the affidavits of the Board members reveal that Plaintiff had a poor relationship with the majority of the Board, did not communicate well with the community as a whole, and had a remarkably poor rapport with GHA's tenants and applicants.[19] Plaintiff also repeatedly and persistently failed to provide information requested by the Board and ad-

mittedly violated GHA travel policy. The Court expressly notes that Plaintiff does not allege that the independent management review conducted by Ventana was influenced by the Board. Moreover, Plaintiff does not argue that Ventana was unqualified to conduct the review, or that Ventana's opinions are not legitimate expert opinions which were entitled to credence by the Board.

After carefully reviewing the enormous bulk of evidence surrounding Plaintiff's dismissal, the Court finds it absolutely obscene, indeed almost criminal, that Plaintiff now has the unmitigated gall to turn around and sue the very organization that he almost single-handedly destroyed with his own self-indulgent despotism. The GHA, now in financial shambles, owns and manages a sizable amount of dilapidated and dangerous property in Galveston. It is obligated to provide fair, clean, safe, and decent housing and rental assistance to large numbers of Galveston's most needy population, involving quite literally millions of dollars every year in rent, federal rental subsidy funds, and development funds. Mr. Norris has amply demonstrated absolutely no concern for these urgent needs, has seriously compromised the GHA's ability to fulfill its humanitarian mandate, and even now seeks to milk the last blood from the cow he has seriously prostrated. The Court notes that these funds do not grow on trees. Instead, they are wrenched from the pockets of every local citizen who expected him to do an honest job. The GHA was established to serve the least fortunate citizens of Galveston. These citizens deserve competent leadership in the GHA, not fetid dregs after the fattest hog has licked the

---

19. The following is taken from the independent management review conducted by Ventana:

> Former employees and managers describe an idiosyncratic management style of the Executive Director. As an example, managers who were invited to accompany him to a luncheon or official business function were forbidden to speak to other guests at the same table. Instead, they were required to pass the Executive Director a note stating the nature of their comments and if the Executive Director wishes for them to speak he would bring them into the conversation ... With such a "high control" style, a bureaucratic mentality takes hold and style and image become more important than substance, results and people. There is an

> inordinate preoccupation with image and one's own sense of importance within the GHA.... The Executive Director and his Deputy each have elaborate security systems in their private offices, while drug traffickers operate in broad daylight at neighboring Palm Terrace.
>
> ...
>
> The base business and its "nuts and bolts" take a back seat to senior management's grandiose visions and abiding need to maintain control of a poorly organized and poorly informed staff, who along with the residents are being used as political pawns by an Executive Director whose Board and community are deeply split over the issue of public housing and its role in the City of Galveston.

trough dry. Unfortunately, they did not get such leadership from Plaintiff; instead, as the overwhelming bulk of the evidence submitted reveals, they received complete and utter incompetence, or worse arrogant deceit, causing not only financial losses for the GHA, but also a loss of confidence from residents and a loss of respect for the GHA in the community. The monies that Plaintiff squandered at the GHA were monies which rightfully belonged to the citizens of Galveston. It is clear from the summary judgment evidence in this case that Plaintiff was a major player in local Galveston politics, with an eye solely to his own greedy self interest. Now that Plaintiff has lost at the game of politics, he asks this Court to sort through the wreckage and force the citizens to compensate him for his legally valid termination.[20] This Court absolutely refuses to add such insult to the devastating injuries Plaintiff has inflicted upon the GHA and this entire community.

Understanding that good cause is normally a question for the trier of fact, the Court in this case finds that circumstances clearly exist which warrant the determination of good cause by the Court. Thus, viewing the summary judgment evidence in a light most favorable to the Plaintiff, the Court finds that overwhelmingly good cause existed for Plaintiff's termination. Because the Court finds that the Board, as a matter of law, had good cause to terminate Plaintiff, his breach of contract claim is hereby emphatically **DISMISSED WITH PREJUDICE.**[21]

## IV. PLAINTIFF'S CIVIL RIGHTS CAUSES OF ACTION AND THE MCDONNELL DOUGLAS/BURDINE FRAMEWORK

A. *All of Plaintiff's Civil Rights Claims Require a Showing of Intentional Discrimination.*

Although Plaintiff does not specifically mention these statutes, a fair reading of Plaintiff's Second Amended Complaint indicates that Plaintiff is alleging civil rights violations. Specifically, it appears that Plaintiff is claiming that Defendants were motivated by racial animosity when they terminated him; such behavior is prohibited by of 42 U.S.C. §§ 1981, 1983, 1985.

Section 1981 prohibits racial discrimination in the making and enforcement of contracts. *See id.* § 1981(b) ("[T]he term 'make and enforce contracts' includes the termination of contracts."). Section 1983 prohibits civil rights violations by persons acting under "color of law." Title 42, § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the

20. This entire case leaves the Court literally appalled. In over seven years on one of the most active courts in the country, this is the most egregious example of litigation abuse the Court has ever seen. While the Court fully expects that he lacks the moral capacity, Mr. Norris should simply be ashamed of himself.

21. Alternatively, the doctrine of governmental immunity bars Plaintiff's breach of contract claim against the GHA, the Board and the individual members. Governmental immunity consists of two principals of law. First, the state as a sovereign cannot be sued without its permission. *See, e.g., Hosner v. De Young,* 1 Tex. 764, 769 (1847); *Dillard v. Austin Indep. Sch. Dist.,* 806 S.W.2d 589, 592 (Tex.App.—Austin 1991, writ denied). This principal bars the suit unless the state has expressly consented to being sued. *See, e.g., Missouri Pac. R.R. v. Brownsville Navigation Dist.,* 453 S.W.2d 812, 814 (Tex.1970). Second, the state has immunity from liability even though the state has consented to being

sued. *See, e.g., State v. Isbell,* 127 Tex. 399, 94 S.W.2d 423, 424 (Tex.Comm.App.1936) (noting a distinction between the creation of liability on the part of the state and the mere waiver of immunity). The waiver of governmental immunity is a matter properly addressed to the state legislature. *See Lowe v. Texas Tech. Univ.,* 540 S.W.2d 297, 298 (Tex.1976). In this case, Plaintiff has not shown that the state has consented to his suit against the individual members in their official capacities, the Board, or the GHA. He has not shown that the enabling legislation of the GHA allows such suits. *See* Tex.Gov't Code Ann. §§ 493.001–493.002. Although it is true that the state waives its immunity from liability when it contracts, the contracting party must first obtain permission to sue. *See, e.g., Fristoe v. Blum,* 92 Tex. 76, 45 S.W. 998, 999 (1898); *Dillard,* 806 S.W.2d at 592; *Ferguson v. Johnson,* 57 S.W.2d 372, 376 (Tex.Civ.App.—Austin 1933, writ dism'd); *State v. Elliott,* 212 S.W. 695, 698 (Tex. Civ.App.—Galveston 1919, writ ref'd).

Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983.[22] Section 1985, on the other hand, prohibits conspiracies to violate rights independently protected by the laws and Constitution. *See* 42 U.S.C. § 1985.

In order to state a cause of action for racial discrimination in the making and enforcement of contracts under § 1981, Plaintiff must demonstrate intentional discrimination. *See General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982); *National Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio,* 40 F.3d 698, 714 (5th Cir.1994). Likewise, to state a claim of racial discrimination under § 1983, Plaintiff must show that Defendants were motivated by intentional discrimination on the basis of race. *See Washington v. Davis,* 426 U.S. 229, 238–42, 96 S.Ct. 2040, 2046–49, 48 L.Ed.2d 597 (1976); *Vera v. Tue,* 73 F.3d 604, 609 (5th Cir.1996). Finally, to recover damages for a conspiracy to deny individuals the equal protection of the laws under § 1985, Plaintiff again must demonstrate that Defendants were motivated by an invidious discriminatory animus. *See Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); *Almon v. Sandlin,* 603 F.2d 503, 505 (5th Cir.1979).[23]

In this case, the key determination in Plaintiff's § 1981, § 1983, and § 1985 claims is the existence, or nonexistence, of intentional racial discrimination. Because the crucial issue in all three claims is the same, the Court will explicitly discuss only the § 1981 claim, but its discussion applies to Plaintiff's § 1985 and § 1983 claims as well. *See Jatoi v. Hurst–Euless–Bedford Hosp. Authority,* 807 F.2d 1214, 1218 n. 2 (5th Cir.1987), *modified upon pet. for reh'g on other grounds by* 819 F.2d 545 (5th Cir.1987) (en banc); *Earnest v. Lowentritt,* 690 F.2d 1198, 1202 (5th Cir.1982) (noting that even if the acts of the defendants were considered to have risen to the level of independent illegal actions, a *prima facie* case under § 1985(3) still failed because plaintiff could not ascribe to the defendants any racially-based motive); *Ramirez,* 615 F.2d at 169.

■ The Fifth Circuit applies the burden shifting analytical framework first established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),[24] to analyze claims of intentional dis-

**22.** Despite the markedly voluminous pleadings on file herein, the Court remains unclear on what basis Plaintiff claims a violation of § 1983. The Court notes that the Motions and Responses submitted by both parties were disorganized and confusing. Section 1983 itself creates no rights, but instead, merely provides a remedy for the violation of rights guaranteed elsewhere. *See Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985). It is axiomatic that violation of state law alone does not give rise to an action under § 1983. *See Williams v. Treen,* 671 F.2d 892, 900 (5th Cir. 1982) (observing that a § 1983 plaintiff "must allege a deprivation of a federally protected right in order to set forth a prima facie case"). Indeed a mere breach of contract does not establish a violation of § 1983. *See Braden v. Texas A & M University System,* 636 F.2d 90, 93 (5th Cir. 1981). The Court assumes that Plaintiff brings his § 1983 claim on the basis of race and in conjunction with his other civil rights claims.

**23.** At the outset, the Court disposes of Plaintiff's § 1983 claim based upon a lack of intentional discrimination as a matter of law. A fair reading of Plaintiff's Second Amended Complaint reveals that Plaintiff does not pursue his § 1983 claim on the basis of due process; therefore, the Court does not address Plaintiff's § 1983 claim on that basis. The Court notes, however, that Plaintiff received the "process" guaranteed him by his employment contract and the United States Constitution. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 545–46, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985) (noting that a pretermination hearing is simply an initial check against making a mistaken decision); *Lassiter v. Dep't of Social Services,* 452 U.S. 18, 25 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640 (1981) (declaring that what constitutes fundamental fairness is drawn form the totality of the circumstances). Indeed, Plaintiff chose the date of the hearing, was allowed counsel, and was allowed to choose whether the hearing was public or private.

The Court also notes that there is a property interest in employment only if there is entitlement to the position under state law. *See Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). Having already established that good cause existed for termination, Plaintiff has no *property* interest with which to establish a due process claim. *See id.; see also Henderson v. Sotelo,* 761 F.2d 1093, 1094 (5th Cir.1985); *Brown v. City of Galveston,* 870 F.Supp. 155, 158 (S.D.Tex.1994).

**24.** *McDonnell Douglas* was refined in Texas *Department of Community Affairs v. Burdine,* 450

crimination. *See Armstrong v. City of Dallas*, 997 F.2d 62, 65 n. 2 (5th Cir.1993). Thus, the burden shifting framework of *McDonnell Douglas/Burdine* applies to Plaintiff's § 1981, § 1983, and § 1985 claims.[25]

Under the *McDonnell Douglas/Burdine* framework, the Court employs a three-part test designed to determine the motivation of the defendant in taking the challenged action. *See McDonnell Douglas*, 411 U.S. at 803–04, 93 S.Ct. at 1824–25; *Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1093–94. First, the plaintiff is required to establish a *prima facie* case wherein he must establish the elements of the discrimination claim. If the plaintiff proves his *prima facie* case, a presumption of discrimination arises. *See Bodenheimer v. PPG Industries, Inc.*, 5 F.3d 955, 957 (5th Cir.1993). The burden of production then shifts to the defendant to rebut this presumption by articulating a legitimate, nondiscriminatory reason for the alleged discriminatory action. *See Olitsky v. Spencer Gifts, Inc.*, 964 F.2d 1471, 1478 n. 19 (5th Cir.1992). A defendant meets this burden by proffering admissible evidence of an explanation that would be legally sufficient to justify a judgment for the defendant. *See Guthrie v. Tifco Indus.*, 941 F.2d 374, 376 (5th Cir. 1991). The defendant need not persuade the trier of fact that there was no intentional discrimination; it need only produce evidence on that point. *See St. Mary's*, 509 U.S. at 507, 113 S.Ct. at 2747. Third, once the defendant satisfies this burden, the presumption of discrimination established by the plaintiff's *prima facie* case dissolves. *See Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10. The plaintiff's burden of persuasion then arises, and the plaintiff must produce evidence that the defendant's proffered reasons are mere pretexts, the real reason

for the action having been based on an impermissible *animus*. *See id.* at 256, 101 S.Ct. at 1095; *Bodenheimer*, 5 F.3d at 959. The plaintiff may succeed here, either by persuading the Court that a discriminatory reason more likely motivated the defendant or by showing that the defendant's proffered reason is unworthy of credence. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The ultimate burden of proof of intentional discrimination rests at all times on the plaintiff. *See St. Mary's*, 509 U.S. at 507, 113 S.Ct. at 2749.

Summary judgment is particularly appropriate when the Court is evaluating evidence at the "pretext" stage of the *McDonnell Douglas* analysis.

> "[I]t is relatively easy both for a plaintiff to establish a *prima facie* case and for a defendant to articulate a legitimate, nondiscriminatory reason for his decision.... In the context of summary judgment ..., the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext."

*Britt v. The Grocers Supply Co.*, 978 F.2d 1441, 1450 (5th Cir.1992) (quoting *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 811 (5th Cir.1991) (citations omitted)). Speculation and belief are insufficient to create a fact issue as to pretext. *See Britt*, 978 F.2d at 1451. Nor can pretext be established by mere conclusory statements of a plaintiff who feels that he has been discriminated against. *See E.E.O.C. v. Exxon Shipping Co.*, 745 F.2d 967, 976 (5th Cir.1984).

To establish a *prima facie* case of discriminatory discharge, the Plaintiff must show that:

(1) he is a member of a protected class;

---

U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and was recently clarified in St. *Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Both *McDonnell Douglas* and *St. Mary's* involved racial discrimination.

**25.** Liability under 42 U.S.C. § 1981 requires the same legal analysis as a Title VII disparate treatment claim. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989); *see also Ramirez v. Sloss*, 615 F.2d 163, 168 (5th Cir.1980) (declaring that

in the Fifth Circuit, a plaintiff pursuing a § 1981 claim must establish intentional discrimination); *Williams v. Dekalb County*, 582 F.2d 2, 2–3 (5th Cir.1978) (same). Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to discharge or otherwise discriminate against an individual with respect to that person's compensation, terms, conditions, or privileges of employment, or to otherwise adversely affect the person's status as an employee, because of that person's race. *See* 42 U.S.C. § 2000e–2(a).

(2) he was qualified for the position;

(3) he was subjected to adverse employment action; and

(4) he was replaced by a similarly situated white male.

*McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Ward v. Bechtel Corp.,* 102 F.3d 199, 202 (5th Cir.1997); *see also E.E.O.C. v. Texas Instruments, Inc.,* 100 F.3d 1173, 1180 (5th Cir.1996); *Meinecke v. H & R Block,* 66 F.3d 77, 83 (5th Cir.1995).

### B. Pretext?

■ Assuming that Plaintiff has established a *prima facie* case,[26] Defendants have proffered eighteen reasons as a legitimate and nondiscriminatory basis for Plaintiff's termination. The Court finds these reasons overwhelmingly sufficient to dissolve the inference of discrimination, and now turns to the issue of pretext. In addition to attacking *some* of the eighteen reasons offered by Defendants, Plaintiff alleges that he was terminated because of the Board's desire to end desegregation of public housing in Galveston. Plaintiff argues, as proof of this "desire," bare allegations of Board efforts to sell all family housing property owned by the GHA which was not within that area in Galveston traditionally known as a low-income area.

The Court observes at the outset that Plaintiff attempts to establish intentional racial discrimination against *him* by pointing to the Board's actions and *perceived intentions* concerning where to acquire GHA property in Galveston. The Court understands that in many cases, a plaintiff attempting to establish pretext may use remarks and comments made by employers as proof of racial animus, and therefore, as evidence of pretext. *See Patterson v. P.H.P. Healthcare Corp.,* 90 F.3d 927, 932 (5th Cir.1996) (allowing show-

ing of pretext by establishing the use of racial epithets by employer), *cert. denied,* —— U.S. ——, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997). However, in this case, the Court finds Plaintiff's attempts to establish racial animus by the Board's actions to be so tenuous that they approach the ridiculous. First, Plaintiff does not actually establish that the Board opposed placing GHA properties in city areas not traditionally used for low-income housing. Instead, Plaintiff simply directs the Court's attention to limited remarks made at a Board meeting directed towards putting the sale of one item of GHA property on the agenda for the next meeting. Second, assuming that the Board actually opposed efforts to place low-income housing in nontraditional areas in the City of Galveston, Plaintiff does not even attempt to explain how this opposition equates to racism, nor does he attempt to explain how such racism was a causal factor in his termination. Moreover, Plaintiff offers absolutely no evidence whatsoever that any of the Board members acted with racial animus towards him, the citizens of Galveston, or anyone else for that matter. Indeed, one of the Board members whom Plaintiff accuses of racism is not only an African–American woman, but is also one who has been a recognized and often celebrated leader in the civil rights movement for decades. Bare allegations are not genuine issues of material fact required to survive summary judgment.[27]

The Fifth Circuit has clearly stated that speculation and belief are insufficient to create a fact issue as to pretext. *See Britt,* 978 F.2d at 1451. Moreover, pretext cannot be established by mere conclusory statements of a plaintiff who feels that he has been discriminated against. *See Exxon Shipping Co.,* 745 F.2d at 976. Plaintiff's mere conclusions speculating on the mindset of the Board

---

**26.** In the documents submitted by both parties it is unclear whether Plaintiff was actually replaced by an individual outside of the protected class. Immediately upon Plaintiff's termination, the position was filled on a temporary basis by an African–American woman, Ms. Ellen–Elizabeth Scarlett. Defendants assert that Ms. Scarlett did not seek the position permanently, and it was subsequently filled by a white woman.

**27.** When Plaintiff's contract was extended in March of 1995, two of the individual Defendants named in this lawsuit were on the Board. Some

courts have held that "where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Proud v. Stone,* 945 F.2d 796, 797 (4th Cir.1991); *see LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 847 (1st Cir.1993); *Lowe v. J.B. Hunt Transp. Inc.,* 963 F.2d 173, 175 (8th Cir. 1992).

members is insufficient to establish pretext in this case. There is absolutely no evidence of any purposeful or intentional racial discrimination, or that race was in any way a factor in Plaintiff's termination. Indeed, Plaintiff's attempts to make this case into a civil rights case are so weak as to work a genuine disservice regarding both public and judicial perception of the valid claims of people who really have suffered at the hands of racial prejudice. Such a waste of judicial assets is intolerable. This is an alleged breach of contract case, nothing more. Defendants have produced overwhelming evidence of legitimate, nondiscriminatory reasons for his discharge, and Plaintiff does not raise a single fact issue that the reasons advanced for his discharge are pretextual. *See Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095 (declaring that a plaintiff must show "that a discriminatory reason more likely motivated the employer" or "that the employer's proffered explanation is unworthy of credence."). Every story has an ending; this story ends here. Plaintiff's claims alleging violations of § 1981, § 1983, and § 1985 against ALL[28] Defendants are **DISMISSED WITH PREJUDICE.**

For the reasons set forth above, Defendants' Motion for Summary Judgment is **GRANTED,** and Plaintiff's Motion for Summary Judgment is **DENIED.** Therefore, all of Plaintiff's claims asserted against all Defendants in this action are hereby **DISMISSED WITH PREJUDICE.** The parties are **ORDERED** to bear their own taxable costs and expenses incurred herein to date. The parties are also **ORDERED** to file no further pleadings on these issues in this Court, including motions to reconsider or the like, unless justified by a compelling showing of new evidence not available at the time of the instant submissions. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the Fifth Circuit Court of Appeals, as may be appropriate in due course.

**IT IS SO ORDERED.**

---

**28.** The Court dispenses with Plaintiff's underlying civil rights claims because he cannot show intentional discrimination; therefore, the Court need not reach Defendant's argument that the individual officers of GRACE cannot conspire with themselves or that the Board cannot conspire with the GHA. On their face the Court notes that these arguments lack merit. However, the Court also notes that the insufficiency of the conspiracy allegations would preclude pursuit of such a claim. *See Sparks v. Duval County Ranch Co.,* 604 F.2d 976 (5th Cir.1979); *Zentgraf v. Texas A & M University,* 492 F.Supp. 265, 272 (S.D.Tex.1980) ("Plaintiff's allegation of conspiracy is conclusory and can not, absent supporting material facts, survive a motion to dismiss.") (Kent, J.).

Moreover, the Court need not reach Defendants' immunity arguments. However, the Court observes that at least one Texas court has held that the Board functions as a legislative body. *See Kennon,* 182 S.W.2d at 373. Legislative immunity is an absolute bar to governmental liability. *See Hughes v. Tarrant County Texas,* 948 F.2d 918, 920 (5th Cir.1991). The Court further notes that under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), government officials performing discretionary functions are immune from liability for damages so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. In *Harlow v. Fitzgerald,* 457 U.S. 800, 815–19, 102 S.Ct. 2727, 2736–39, 73 L.Ed.2d 396 (1982), the Supreme Court adopted an objective standard for qualified immunity, and abolished the previous subjective good faith test. In light of the overwhelming evidence regarding Plaintiff's job performance, the Court finds that the decision to terminate him, if discretionary, is objectively reasonable as a matter of law.

The Court also does not reach Defendant GRACE's argument that GRACE and its directors cannot be liable under § 1983 because they did not act under color of law. Nor does it reach arguments that GRACE cannot be an alter ego of the GHA.